CHRISTI HOGIN, Bar No. 138649
Christi.Hogin@bbklaw.com
JOHN C. COTTI, Bar No. 193139
John.Cotti@bbklaw.com
KATHY J. SHIN, Bar No. 318185
Kathy.Shin@bbklaw.com
BEST BEST & KRIEGER LLP
1230 Rosecrans Avenue
Suite 110
Manhattan Beach, California 90266
Telephone: (310) 643-8448
Facsimile: (310) 643-8441

Attorneys for Defendant
CITY OF MALIBU

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS SEIDER and LEAH SEIDER, as Trustees of the Seider Family Trust,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF MALIBU,<br><br>Defendant. | Case No. 2-20-cv-08781 PA (MRWx)<br><br>**CITY OF MALIBU'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS**<br><br>*Filed Concurrently with*<br>1. *Notice of Motion and Motion; Memorandum of Points and Authorities*<br>2. *Declaration re Meet and Confer*<br><br>Honorable Percy Anderson Presiding<br><br>Date: January 4, 2021<br>Time: 1:30 p.m.<br>Dept: Courtroom 9A |

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1230 ROSECRANS AVENUE, SUITE 110
MANHATTAN BEACH, CALIFORNIA 90266

1

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1230 ROSECRANS AVENUE, SUITE 110
MANHATTAN BEACH, CALIFORNIA 90266

1    Pursuant to Rule 201(b) of the Federal Rules of Evidence, Defendant City of

2    Malibu ("City") hereby requests that the Court take judicial notice of the following

3    documents in support of City's Motion to Dismiss Plaintiffs' Complaint:

4        1.    A true and correct copy of Section 2.1 ("General Definitions"), Section

5    3.15 ("Signs"), and Chapter 13 ("Coastal Development Permits") of the Malibu

6    Local Coastal Program ("LCP") Local Implementation Plan ("LIP") attached hereto

7    as **Exhibit A**.  The Malibu LIP is a certified public record that can be accessed on

8    the City's official website found at http://qcode.us/codes/malibu-coastal/.  Such

9    "matters of public record" are appropriate subjects of judicial notice. (*United States*

10   *v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir.

11   2008); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 n. 6

12   (9th Cir. 2006) (finding courts "may take judicial notice of court filings and other

13   matters of public record".)

14       2.    A true and correct copy of the City of Malibu Planning Department

15   Uniform Application attached hereto as **Exhibit B**.  The City's Uniform

16   Application is a public record on file with the City of Malibu Planning Department,

17   which can be accessed on the City's official website found at

18   https://www.malibucity.org/DocumentCenter/View/13101/Application_Uniform?bi

19   dId.  The application is also relevant to resolution of the above-captioned matter

20   and referenced in both Plaintiffs' Complaint and City's Motion to Dismiss.  As

21   such, the application may be subject to judicial notice. (*See Santa Monica Food Not*

22   *Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (taking

23   judicial notice of city's event permit application and indemnity agreement).)

24       3.    A true and correct copy of Section 17.68.070 of the Malibu Municipal

25   Code attached hereto as **Exhibit C**.  The Malibu Municipal Code is a certified

26   public record that can be accessed on the City's official website found at

27   https://qcode.us/codes/malibu/.  "Municipal ordinances are proper subjects for

28   judicial notice." (*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist*., 498 F.3d

1    1031, 1039 n.2 (9th Cir. 2007).)

2

3    Dated:  December 3, 2020                    Respectfully submitted,

4

5                                        By: */s/ Kathy J. Shin*
6                                            CHRISTI HOGIN
                                             JOHN C. COTTI
7                                            KATHY J. SHIN
                                             BEST BEST & KRIEGER, LLP
8                                            Attorneys for Defendant City of Malibu

9

10

11

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
1230 ROSECRANS AVENUE, SUITE 110
MANHATTAN BEACH, CALIFORNIA 90266

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2-20-CV-08781 PA (MRWX)
CITY'S REQUEST FOR JUDICIAL NOTICE

# EXHIBIT A

## 2.1. GENERAL DEFINITIONS

ADJUSTED REGIONAL HOUSING NEEDS ASSESSMENT (RHNA) – the unmet very-low and low-income RHNA after crediting units by income category constructed during the current planning period.

AEROBICS/DANCE STUDIO - a private facility which conducts classes to groups of individuals generally in one room, and does not provide showers, pools, saunas, and other features of a full service health club.

AFFORDABLE HOUSING AGREEMENT – a legally binding agreement between an applicant and the City of Malibu to ensure that continued affordability of the Affordable Housing Units persists, and the units are maintained in accordance with Section 3.7 of the Local Implementation Plan.

AFFORDABLE HOUSING / AFFORDABLE RESIDENTIAL UNIT – a housing unit which is available for sale or for rent to moderate, low and/or very-low income households, as those terms are defined in this chapter.

AFFORDABLE HOUSING DEVELOPMENT - a multi-family residential development in which all of the affordable bonus units are affordable to low and moderate income households.

AFFORDABLE RENT – monthly rent charged to low and very-low income households for housing units as calculated in accordance with Section 50053 of the California Health and Safety Code.

AGGRIEVED PERSON - any person who, in person or through a representative, appeared at a public hearing of the City of Malibu or the California Coastal Commission in connection with the decision or action on a Coastal Development Permit application, or who, by other appropriate means prior to a hearing, informed the City of Malibu or the California Coastal Commission of the nature of his/her concerns or who for good cause was unable to do either. "Aggrieved person" includes the applicant for a Coastal Development Permit.

AGRICULTURAL EMPLOYEE - a person who works full or part-time (twenty-four (24) hours or more per week) in the service of a commercial agricultural operation.

AGRICULTURAL EMPLOYEE HOUSING – any living quarters or accommodations of any type specifically for agricultural employees and which comply with Health and Safety Code Sections 17008 and 17021.6 and other applicable provisions of the Employee Housing Act.

ALLEY - a public or private right-of-way less than forty feet (40′) wide which affords a means of vehicular access to the side or rear of properties abutting a street or highway.

ANCILLARY ROOM - a loft or other room (den, study or library, for example) not used as a bedroom and which:

    A.    Is substantially open to or overlooks another room (such as a living room, dining room, kitchen or master bedroom);

B.      Serves as an extension of that adjoining room;

C.      Shall not include a bathroom or any other plumbing, or closets; and

D.      Due to its location, layout and/or amenities is not easily usable as an additional bedroom.

APARTMENT UNIT - one or more rooms with private bath and kitchen facilities comprising an independent rental unit.

APPEALABLE COASTAL DEVELOPMENT PERMIT - After certification of the Local Coastal Program an action taken by the City on a Coastal Development Permit application may be appealed to the California Coastal Commission for only the following types of developments:

1.      Developments approved by the City between the sea and the first public road paralleling the sea or within three hundred feet (300′) of the inland extent of any beach or of the mean high tideline of the sea where there is no beach, whichever is the greater distance.

2.      Developments approved by the City not included within paragraph 1 that are located on tidelands, submerged lands, public trust lands, within one hundred feet (100′) of any wetland, estuary, or stream, or within three hundred feet (300′) of the top of the seaward face of any coastal bluff.

3.      Developments approved by the City not included within paragraph (1) or (2) that are located in a sensitive coastal resource area.

4.      Any development which constitutes a major public works project or a major energy facility as defined in this Chapter. The phrase "major public works" or a "major energy facility" as used in Public Resources Code Sec. 30603(a)(5) and in these regulations shall mean: any proposed public works project or energy facility, as defined by Section 13012 of the Coastal Commission Regulations and the Coastal Act.

ARBOR - a shady garden shelter, typically covered with or formed of vines or other climbing plants.

ARCADE, GAME (PENNY) - any premises where there is maintained five or more games of skill or amusement whereby machines, contests, devices, games, tables, boards or amusements, the operation of which is permitted, controlled, obtained, conducted, allowed, authorized or made possible by the depositing of any coin, plate, disc, slug or key into any slot, crevice or other opening or receptacle, or by the payment of any fee or fees, and where said machine, contest, device, game, table, board or amusement tests, or provides a means for testing, the skill of the operator thereof with reference to its operation or the results thereof.

AREA DENSITY DIAGRAM - see FLOOR AREA RATIO.

AREA, NET - that portion of a lot or parcel of land which is:

1.      Not subject to any easement or included as a proposed public or private facility such as an alley, highway or street or other necessary public site within a proposed development project;

2.      Subject to an easement where the owner of the underlying fee has the right to use the entire surface except that portion where the owner of the easement may place utility poles or minor utility structures;

RJN - 6

3.    That portion of a corner lot or corner parcel of land not to exceed five percent (5%) of the net area within a corner cutoff.

Except as above provided, portions of a lot or parcel of land subject to a highway easement or any other private or public easement shall not be counted as a part of the net area.

ART GALLERY - a retail or wholesale establishment featuring exhibits and sale of art work including but not limited to drawings, paintings, sculptures, ceramics, photographs, and other art media.

ARTIST LOFT/STUDIO - A room or structure in which original works of art are created on site and, if living quarters for the artist are included, the living quarters do not exceed fifty percent (50%) of the square footage of the total studio space.

AUTHORIZED ENFORCEMENT OFFICER - the City Manager or his or her designee.

AUTOMOBILE SERVICE STATION - any premises where gasoline and other petroleum products are sold and/or light maintenance activities such as engine tuneups, lubrication, minor repairs and carburetors cleaning are conducted. Automobile services stations shall not include premises where heavy automobile maintenance activities such as engine overhauls, automobile painting and body and fender work are conducted.

AUTOMOTIVE SERVICE FACILITY - a facility that is categorized in any one of the following Standard Industrial Classification (SIC) codes: 5013, 5014, 5511, 5541, 7532-7534, or 7536-7539.

AWNING - a roof-like cover that projects from the wall of a building for the purpose of shielding a doorway or window from the elements.

BAR AND COCKTAIL LOUNGE - saloons, bars, cocktail lounges, nightclubs, pubs, discotheques, taverns and similar places used primarily for drinking and designed for social interaction and/or stage show entertainment.

BASEMENT - that portion of a building or an area enclosed by walls located below finished grade and beneath or partially beneath the first floor footprint above, where the vertical distance from finished grade to the bottom of the finished floor above is no more than 3 vertical feet at all points around the perimeter of all exterior walls. A basement does not constitute a story.

BED AND BREAKFAST INN - a facility offering transient lodging accommodations to the public and providing kitchen facilities adequate to provide meals to the guests of the facility only and not otherwise open to the public.

BEST MANAGEMENT PRACTICES (BMPs) - activities, practices, facilities, and/or procedures that when implemented to their maximum efficiency will prevent or reduce pollutants in discharges and any program, technology, process, siting criteria, operational methods or measures, or engineered systems, which when implemented prevent, control, remove, or reduce pollution. Examples of BMPs may include public education and outreach, proper planning of development projects, proper cleaning of catch basin inlets, and proper sludge- or waste-handling and disposal, as well as storm water treatment and detention facilities (see Structural BMPs), among others.

BICYCLE PARKING SPACE - any permanently maintained bicycle rack or other similar device which is designed for the secure storage of a standard size bicycle.

BLUFF EDGE - For coastal and canyon bluffs, the bluff edge shall be defined as the upper termination of a bluff, cliff, or seacliff. In cases where the top edge of the cliff is rounded away from the face of the cliff as a result of erosional processes

related to the presence of the steep cliff, the bluff edge shall be defined as that point nearest the cliff beyond which the downward gradient of the surface increases more or less continuously until it reaches the general gradient of the cliff. In a case where there is a steplike feature at the top of the cliff face, the landward edge of the topmost riser shall be taken to be the bluff edge. Where a coastal bluff curves landward to become a canyon bluff, the termini of the coastal bluff edge, shall be defined as a point reached by bisecting the angle formed by a line coinciding with the general trend of the coastal bluff line along the seaward face of the bluff, and a line coinciding with the general trend of the bluff line along the canyon facing portion of the bluff. Five hundred feet (500′) shall be the minimum length of bluff line or edge to be used in making these determinations.

BOOKSTORE - any premises which has a substantial or significant portion of its stock in trade books, magazines, periodicals, pamphlets or newspapers.

BUILDING - any structure having a roof supported by columns or walls and intended for the shelter, housing or enclosure of any individual, animal, process, equipment, goods or materials or any kind or nature.

BUILDING, ENCLOSED - a structure which is not open to the air for more than forty percent (40%) of its surface.

BULK - is the total interior cubic volume as measured from the exterior surface of the structure.

CALIFORNIA COASTAL ACT OR COASTAL ACT - is the California Coastal Act of 1976, Division 20 of the Public Resources Code, as amended.

CELLAR - any structure located entirely outside of the first floor footprint of a building, and located entirely below grade, except for an opening for pedestrian ingress and egress that shall have a minimum clear width of at least thirty (30) inches and a maximum clear width of forty-eight inches (48″).

CENTERLINE - where reference is made to the 'centerline' of any parkway, major or secondary highway, such centerline is deemed to be the centerline established by the County engineer for any proposed or dedicated public way which, in whole or in part, is included in any such parkway, major or secondary highway. The established centerlines are those shown on a series of maps entitled County Surveyor's Maps or County Surveyor's Field Maps on file in the office of the County engineer, except that where 2 or more such centerlines are shown on any map in said series of maps, the centerline labeled 'proposed centerline' is deemed to be the centerline of the parkway, major or secondary highway.

CHANGE OF USE - a discontinuance of a use and the substitution of a different use.

CHAPTER THREE POLICIES are those policies of the Coastal Act contained in Chapter Three as amended, commencing with Section 30200, which constitute the standards by which the adequacy of Local Coastal Programs and the permissibility of proposed development subject to the provisions of the Coastal Act are determined.

CITY - the City of Malibu.

CITY COUNCIL - refers to the City Council of the City of Malibu.

CIVIC CENTER WASTEWATER TREATMENT FACILITY (CCWTF) - a public utility facility to be constructed in the Malibu Civic Center area in response to the prohibition on discharges from onsite wastewater treatment systems in order to provide centralized municipal wastewater treatment facilities to affected properties.

CLIFF - any high, very steep to perpendicular or overhanging face of rock, a precipice.

CLUB - a group of people organized for a common purpose to pursue common goals, interests or activities and usually characterized by certain membership qualifications, payment of fees and dues, regular meetings, and a constitution and by-laws.

COASTAL BLUFF - a high bank or bold headland, ten feet (10′) or more in vertical extent, with a broad, precipitous, sometimes rounded cliff face overlooking a body of water.

COASTAL COMMISSION is the California Coastal Commission.

COASTAL DEPENDENT DEVELOPMENT OR USE - any development or use which requires a site on, or adjacent to, the sea in order to be able to function at all.

COASTAL DEVELOPMENT PERMIT - is a permit for any development or use within the coastal zone that is required pursuant to this Chapter and of subdivision (a) of the Coastal Act Section 30600.

COASTAL RESOURCES - include, but are not limited to, public access opportunities, visitor and recreational facilities, water-oriented activities, marine resources, biological resources, environmentally sensitive habitat areas, agricultural lands, and archaeological or paleontological resources.

COASTAL ZONE - means the land and water area boundaries established by the State Legislature as defined in Coastal Act Section 30103.

COMMERCIAL AGRICULTURE - the growing of crops for food or fiber, or grazing or raising of livestock with the intent to sell the products for profit. Commercial agriculture does not include crops or agriculture grown for personal consumption or equestrian uses.

COMMERCIAL DEVELOPMENT - any development on private land that is not heavy industrial, institutional, or residential. The category includes, but is not limited to: hospitals, laboratories and other medical facilities, educational institutions, recreational facilities, plant nurseries, multi-apartment buildings, car wash facilities, mini-malls and other business complexes, shopping malls, hotels, office buildings, public warehouses and other light industrial complexes. For purposes of compliance with Chapter 17 of the LIP (Water Quality Protection Ordinance) only, "commercial development" shall include institutional development.

COMMERCIAL PARKING LOT OR BUILDING - a parking area or structure established or operated as a business, providing off street parking for a fee or charge.

COMMISSION - refers to the Planning Commission of the City of Malibu.

COMMON INTEREST DEVELOPMENT - any residential condominium, residential community apartment house, or residential stock cooperative.

COMMUNICATION EQUIPMENT BUILDING - a building housing operating electrical and mechanical equipment necessary for the conducting of a public utility communications business, with or without personnel.

COMPATIBLE - that which is harmonious with and will not adversely affect surrounding buildings and/or uses.

CONCESSIONS – regulatory allowances which include, but are not limited to, the reduction of site development standards or zoning code requirements, approval of mixed use zoning in conjunction with the Housing Development, or any other regulatory incentive which would result in an identifiable, financially sufficient, and actual cost reductions that are offered in addition to a density bonus.

CONDITIONS OF USE - a development standard determined to be necessary to permit the harmonious introduction of a use in a zone and therefore a prerequisite to place or maintain such use.

CONDOMINIUM - an estate in real property consisting of an undivided interest in common in a portion of a parcel of real property together with a separate interest in space in an apartment building on such real property. A "condominium" may include, in addition, a separate interest in other portions of such real property.

CONDOMINIUM ASSOCIATION - the association which administers and maintains the common property and common elements of a condominium.

CONSERVATION COVER - establishing and maintaining perennial vegetative cover to protect soil and water resources on land retired from agricultural production.

CONVENIENCE STORE - any retail establishment offering for sale pre-packaged food products, household items, and other goods commonly associated with the same and having a gross floor area of less than 5000 square feet.

CONVERSION – a change of a residential dwelling, including a mobile home, as defined in Section 18008 of the Health and Safety Code, or a mobile home lot in a mobile home park, as defined in Section 18214 of the Health and Safety Code, or a residential hotel, as defined in paragraph (1) of subdivision (b) of Section 50519 of the Health and Safety Code, to a condominium, cooperative, or similar form of ownership, or to a non-residential use.

COUNCIL - refers to the City Council of the City of Malibu.

COUNTY - refers to the County of Los Angeles.

COUNTY ENGINEER - refers to the County Engineer of the County of Los Angeles.

CRITICAL AREA PLANTING - planting vegetation, such as trees, shrubs, vines, grasses, or legumes, on highly erodible or critically eroding areas. Critical Area Planting does not include tree planting mainly for wood products.

CROP RESIDUE USE - using plant residues to protect cultivated fields during critical erosion periods.

DECK - an open porch or platform which projects more than 2 feet from the adjacent structure or is freestanding and at least 2 feet in width.

DEMOLITION - the deliberate removal or destruction of the frame or foundation of any portion of a building or structure for the purpose of preparing the site for new construction or other use.

DENSITY BONUS – a density increase for residential units over the otherwise allowed residential density under the applicable zoning and land use designation on the date an application is deemed complete.

DENSITY BONUS UNITS – those additional residential units gained pursuant to the provisions of the Density Bonus Ordinance.

DEVELOPMENT - means, on land, in or under water, the placement or erection of a solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; change in density or intensity of use of land, including but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water; or access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private or public or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes; kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511).

As used in this section "structure" includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line.

DEVELOPMENT AREA - the approved portion of a project site that is developed, including the building pad and all graded slopes, all structures, and parking areas. If it is demonstrated that it is not feasible from an engineering standpoint to include all graded slopes within the development area, then graded slopes may be excluded from the approved development area. The area of one access driveway or roadway not to exceed twenty feet wide, and one hammerhead safety turnaround, as required by the Los Angeles County Fire Department not located within the approved building pad shall be excluded from the total development area. The fuel modification area required by the Los Angeles County Fire Department for approved structures may extend beyond the limits of the approved development area.

DISASTER - means any situation in which the force(s) which destroyed a structure were beyond the control of its owners.

DISCRETIONARY PROJECT - defined in the same manner as Section 15357 of the Guidelines for Implementation of the California Environmental Quality Act contained in Title 14 of the California Code of Regulations, as amended, and means a project which requires the exercise of judgment or deliberation when the City decides to approve or disapprove a particular activity, as distinguished from situations where the City merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations.

DIVERSION - a channel constructed across the slope with a supporting ridge on the lower side.

DOMESTIC ANIMAL - an animal which is commonly maintained in residence with humans.

DORMITORY - a building used as group living quarters for a student body in conjunction with a college, university, boarding school, orphanage or other similar institutional use.

DRIPLINE - a vertical line extending from outermost portion of a tree canopy to the ground.

DRY CLEANING ESTABLISHMENT - any premises, equipped to perform the service as defined in the California Business and Professions Code. A 'dry cleaning establishment' may include a dry cleaning agency, a retail or wholesale dry cleaning plant and dry cleaning, self-service or coin operated.

RJN - 11

DRY CLEANING PLANT, RETAIL - a plant, the gross sales of which consist of at least fifty-one percent (51%) of direct sales to persons other than licensed dry cleaners.

DRY CLEANING PLANT, WHOLESALE - a plant, the gross sales of which consist of at least fifty-one percent (51%) of sales to licensed dry cleaners.

DWELLING, SINGLE-FAMILY - a building containing one dwelling unit constructed entirely onsite, or a unit constructed and/or assembled off-site, including mobile homes manufactured and certified under the National Mobilehome Construction and Safety Standards Act of 1974 and located on a permanent foundation system approved by the Building Department.

DWELLING UNIT - one or more rooms in a building or portion thereof designed, intended to be used or used for occupancy by one family for living and sleeping quarters and containing only one kitchen. 'Dwelling unit' also includes:

A.    One or more habitable rooms within a mobile home which are designed to be occupied by one family with facilities for living, sleeping, cooking, eating and sanitation; and

B.    Any room used for sleeping accommodations which contains a bar sink and/or gas, electrical or water outlets designed, used or intended to be used for cooking facilities except a guest room or guest suite in a hotel; and

C.    Each space or pad designed and allocated to accommodate a mobile home within a mobile home park.

DWELLING UNIT, EFFICIENCY - a dwelling unit consisting of not more than one habitable room together with a kitchen or kitchenette and sanitary facilities.

EASEMENT - a grant of one or more of the property rights by the property owner to and/or for the use by the public, a corporation or another person or entity.

EFFECTIVE DATE OF THE COASTAL ACT - is February 1, 1973 for areas subject to the California Coastal Zone Conservation Act and is January 1, 1977 for those areas identified as the Coastal Zone and subject to the California Coastal Act of 1976.

EFFECTIVE DATE OF THE MALIBU LOCAL IMPLEMENTATION PLAN - is September 13, 2002.

EMERGENCY - means a sudden unexpected occurrence demanding, immediate action to prevent or mitigate loss or damage to life, health, property or essential public services.

EMERGENCY COMMUNICATION AND SERVICE FACILITY - A structure whose primary purpose is for communication or communication-related service activity in support of emergency response activities. Such facilities are typically unmanned, and during emergencies are not used as centers for emergency personnel.

EMERGENCY SHELTER – housing with minimal supportive services for homeless persons, which is limited to occupancy of 6 months or less by a homeless person and is operated by a government agency or private non-profit organization.

EMPLOYEE HOUSING – means "employee housing" as defined in Health and Safety Code Section 17008.

**RJN - 12**

ENCROACH - to conduct any development activity within the protected zone of a tree protected under section 5.2 or to intentionally damage any part of a protected tree or its root system, including but not limited to, burning, applying toxic substances, overwatering, operating machinery, paving, changing the natural grade, or excavating.

ENERGY FACILITY - any public or private processing, producing, generating, storing, transmitting, or recovering facility for electricity, natural gas, petroleum, coal, or other source of energy.

ENVIRONMENTALLY SENSITIVE HABITAT AREA (or ESHA) - is any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments.

EXCLUSIVE USE - means a use that precludes use in the area of the event for public recreation, beach access or access to coastal waters other than for or through the event itself.

EXECUTIVE DIRECTOR - is the Executive Director of the California Coastal Commission.

EXTREMELY-LOW INCOME (ELI) HOUSEHOLD – a household whose income does not exceed 30 percent (30%) of the area median income for Los Angeles County, as published and periodically updated by the State Department of Housing and Community Development, pursuant to Section 50052.5 of the California Health and Safety Code.

FACADE - the exterior wall of a building exposed to the public view or that wall viewed by persons not within the building.

FAMILY - one or more individuals occupying a dwelling unit and living as a single household.

FEASIBLE - means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.

FENCES, WALLS AND HEDGES - artificially constructed barriers of any material or combination of materials erected to enclose or screen an area of land. See also OPEN FENCING.

FILL - any earth or material or substance, including pilings, placed for the purposes of erecting structures thereon, placed in a submerged or upland area.

FILTER STRIP - a strip or area of vegetation for removing sediment, organic matter, and other pollutants from runoff and wastewater.

FIRST PUBLIC ROAD PARALLELING THE SEA or FIRST PUBLIC ROAD - shall mean that road nearest the sea, as defined in this Section, and which meets all of the following criteria:

1.     The road is lawfully open and suitable for uninterrupted use by the public;

2.     The road is maintained by a public agency;

RJN - 13

3.      The road contains an improved all-weather surface open to motor vehicle traffic in at least one direction;

4.      The road is not subject to any restrictions on use by the public except during an emergency or for military purposes; and

5.      The road connects with other public roads providing a continuous access system and generally parallels and follows the shoreline of the sea so as to include all portions of the sea where the physical features such as bays, lagoons, estuaries and wetlands cause the waters of the sea to extend landward of the generally continuous coastline.

FLAG, OFFICIAL - an official flag of the United States of America and other nations, states, countries, or municipalities.

FLOOR AREA, GROSS - the sum of the gross horizontal areas of the several floors of a building measured from the interior face of exterior walls, or from the centerline of a wall separating 2 buildings, but not including interior parking spaces, loading space for motor vehicles, vehicular maneuvering areas, or any space where the floor-to-ceiling height is less than 6 feet.

FLOOR AREA RATIO - the formula for determining permitted building area as a percentage of lot area; obtained by dividing the above-ground gross floor area of a building or buildings located on a lot or parcel of land by the total area of such lot or parcel of land.

FRONTAGE, BUILDING - the exterior building wall of a ground floor business establishment on the side or sides of the building fronting and/or oriented toward a public street or highway. 'Building Frontage' shall be measured continuously along said building wall for the entire length of the building establishment, including any portion thereof which is other than parallel to the remainder of the wall.

FRONTAGE, PRIMARY COMMERCIAL - the portion of a commercially zoned lot which parallels the block face which contains the greatest amount of commercial zoning.

FRONTAGE, STREET - that portion of a lot or parcel of land which borders a public street. 'Street Frontage' shall be measured along the common lot line separating said lot or parcel of land from the public street, highway or parkway.

GAME ROOM or GAMING AREA - an area designated exclusively for customer participation entertainment providing gaming, pool tables, pinball machines, etc.

GARAGE - a deck, building, structure or part thereof, used or intended to be used for the parking and storage of motor vehicles.

GARAGE SALE - any sale held for the purpose of selling, trading or otherwise disposing of unwanted household furnishings, personal goods or other tangible properties of a resident of the premises on which the sale is conducted in a residential zone.

GARAGE, SEMI-SUBTERRANEAN - a structure used for parking and storage of vehicles located partly underground with the finished floor of the first level of the structure averaging not more than fifty percent (50%) above the average natural or existing grade of the parcel, except for openings for ingress and egress.

GARAGE, SUBTERRANEAN - that portion of a building or an area enclosed by walls, used for parking and storage of vehicles, which is located below finished grade and beneath or partially beneath the first floor footprint above, where the vertical distance from finished grade to the bottom of the finished floor above is no more than 3 vertical feet at all points around the perimeter of all exterior walls, except for that portion of the wall with the opening for vehicular ingress and egress. A subterranean garage does not constitute a story.

GEOTECHNICAL HAZARD - soils or geologic conditions that could adversely affect the safety of the building site in accordance with the current Building Code.

GOOD HOUSEKEEPING PRACTICES - common practices related to the storage, use, or cleanup of materials, performed in a manner that minimizes the discharge of pollutants. Examples include, but are not limited to, purchasing only the quantity of materials to be used at a given time, use of alternative and less environmentally harmful products, cleaning up spills and leaks, and storing materials in a manner that will contain any leaks or spills.

GRADE (finished) - the finished ground level around the perimeter at all exterior walls of a building.

GRADE (ground level) - the natural or finished ground level at all walls of a building, whichever results in a lower building height. In cases where walls are parallel to and within five feet of sidewalks, the above ground level shall be measured at the sidewalks.

GRADING PROJECT, OFF SITE TRANSPORT - any excavation or fill, or combination thereof, necessary and incidental to impending building construction or other lawful development which will require the removal from, or importation to, a lot or parcel of land more than 5,000 cubic yards of dirt, soil, sand, gravel, rock, clay, decomposed granite or other minerals along a transport route having more than ten (10) occupied dwelling units in single or two family residences, apartment houses, mobile homes or any combination thereof, or having a hospital or an accredited public or private school offering instruction required to be taught by the Education Code of the State of California, located within a parallel corridor two hundred (200) feet wide on each side of and measures from the edge of the existing right-of-way for a distance equal to the extent of such route of for a distance of 2,640 feet, whichever distance is less. 'Impending building construction or development' shall mean the initiation of such construction or development within one year.

GRADE PROJECT, ON SITE - any excavation or fill, or combination thereof, requiring a grading permit under the provisions of Chapter 1 of Article VIII (Building Code) of this Code which will involve a volume of earth greater than 50,000 cubic yards, whether filed as one permit or the cumulative total of more than one permit on the same lot or parcel of land within a one-year period.

GRAND OPENING - an advertising event which has as its purpose, the promotion of a newly opened use, a change in the orientation of a use or reopening of a use following remodeling or major renovation.

GRASSED WATERWAY - a natural or constructed channel that is shaped or graded to required dimensions and established in suitable vegetation for the stable conveyance of runoff.

GREATER THAN 9 UNIT HOME SUBDIVISION - any subdivision being developed for ten (10) or more single-family or multi-family dwelling units.

GROUND FLOOR - the first floor of a building other than a cellar or basement.

GUEST HOUSE - attached or detached living quarters on the same premises as a single family residence for the use of family members, guests or employees of the occupants of such residence, containing no kitchen facilities and not rented or otherwise used as a separate dwelling. The maximum living area of a guest house shall not exceed nine hundred (900) square feet, including any mezzanine or storage space. A guest house may include a garage not to exceed four hundred (400) sq. ft. The square footage of the garage shall not be included in the maximum living area.

HABITABLE FLOOR AREA - see LIVING AREA.

HANDICAPPED ACCESSIBLE UNIT - a building or portion of a building containing one dwelling unit, intended or used for the sole occupancy of not more than 2 persons at any time, one of whom is physically or mentally disabled.

HEALTH CARE FACILITIES - any facility, place, or building maintained and operated to provide medical care. Health care facilities include but are not limited to hospitals, intermediate care facilities, clinics, and home health agencies, all of which are licensed by the State of California Health and Human Services Agency. Health care facilities do not include residential care facilities for the elderly.

HEALTH CLUB - means but is not limited to gymnasiums (except public), private clubs (athletic, health or recreational), with full service facilities including but not limited to showers, lockers, pools and saunas.

HEDGES - see FENCES.

HEIGHT, BEACHFRONT LOT - the vertical distance from the lowest recommended finish floor elevation on the ocean side (as defined by a licensed civil engineer, based upon a comprehensive wave action report) and the vertical distance as measured from the centerline of the road on the land side, apportioned such that the height of the portion of the building measured from the centerline of the road is no more than half of the total length (front-to-rear) of the structure.

HEIGHT, NON-BEACHFRONT LOT - the vertical distance between the top of the structure and finished or natural grade, whichever results in a lower building height. (See GRADE)

HELIPORT - any helicopter landing area used, designed or intended to be used for the receiving or discharging of passengers and cargo and shall include any appurtenant facilities for passengers, cargo, or for the servicing, repair, shelter or storage of helicopters.

HELISTOP - any helicopter landing area used, designed or intended to be used for the receiving or discharging of passengers and cargo, but shall not include other appurtenant facilities permitted at a heliport other than a shelter for passengers.

HIGH INTENSITY USE - commercial uses whose activities could adversely impact adjacent residences, schools, or other uses; such as alcohol sales, gasoline stations, automobile and truck repair and parts, twenty-four (24) hour markets, carry out food establishments, entertainment (nightclubs, concert halls, dance clubs, etc.), video arcades, restaurants and bars, and adult businesses.

HIGH OCCUPANCY FACILITIES - all buildings with assembled occupancies of one hundred (100) or more persons.

HILLSIDE - property located in an area with known erosive soil conditions, where the development contemplates grading on any natural slope that is twenty-five percent (25%) or greater.

HOMELESS SHELTER – see EMERGENCY SHELTER.

HOME OCCUPATION - any activity carried out for gain by a resident conducted as an accessory use in the resident's dwelling unit.

HOSPICE - see RESIDENTIAL CARE FACILITY.

HOSPITAL - any institution, place, building or agency licensed by the Departments of Public Health, or Mental Hygiene of the State of California, which maintains and operates organized facilities for the diagnosis, care and treatment of human illness, including convalescence, and includes sanitarium, sanitorium, convalescent home, nursing home and maternity home.

HOSPITAL, SMALL ANIMAL - any facility providing medical or surgical treatment, clipping, bathing or other services, including incidental boarding to dogs, cats and other animals.

HOTEL - a facility offering transient lodging accommodations to the general public and providing additional services, such as restaurants and meeting rooms.

HOTEL ROOM - a unit or room in a hotel or motel, used for transient purposes and not the principal place of residence of the occupant(s).

HOUSEHOLD - a family living together in a single dwelling unit, with a common access to, and common use of, all living and eating areas and all areas and facilities for the preparation and storage of food within the dwelling unit.

HOUSING DEVELOPMENT – a development project for five or more residential units. Within the Density Bonus Ordinance, it shall also include a subdivision or common interest development, a project which rehabilitates and converts a commercial building to a residential use and a condominium conversion of an existing multi-family building.

ILLEGAL NONCONFORMING BUILDING OR USE - a building or use that does not conform to one or more of the provisions of the Malibu Zoning Ordinance and did not lawfully exist on the effective date of applicable chapters of the Malibu Zoning Ordinance.

INCENTIVES – see CONCESSIONS.

INCIDENTAL USE - a use which is secondary to the primary use of a property and which does not intensify the use.

INITIAL SUBSIDY – the fair market value of the home at the time of initial sale, minus the initial sale price to the moderate income household, plus the amount of any down payment assistance or mortgage assistance. If upon resale the market value is lower than the initial market value, then the value at the time of the resale shall be used as the initial market value (e.g. X (fair market value of the home to be purchased) – Y (the price the moderate income household paid for the home) + Z (amount of any down payment assistance) = Initial Subsidy).

INFILL DEVELOPMENT - shall apply to a situation where construction of a single-family dwelling and/or a duplex in limited situations on a vacant lot or the demolition of an existing residential dwelling and construction of a new dwelling is proposed in an existing, geographically definable residential community which is largely developed or built out with similar structures. When applied to beach front development this situation consists of an existing linear community of

**RJN - 17**

beach fronting residences where the vast majority of lots are developed with residential dwellings and relatively few vacant lots exist. Infill development can occur only in instances where roads and other services are already existing and available within the developed community or stretch of beach. Infill development shall not apply to the construction of a shoreline protection device.

INFILL LOT, RESIDENTIAL ZONE - lot where at least eighty percent (80%) of the legal lots within a three hundred foot (300′) radius of the subject lot, but in no event less than ten (10) lots, are developed with a residential structure. "Infill Development" shall apply to a situation where construction of a single-family dwelling and/or duplex in limited situations on a vacant lot or the demolition of an existing residential dwelling and construction of a new dwelling is proposed in an existing, geographically definable residential community which is largely developed or built out with similar structures. When applied to beachfront development, this situation consists of an existing linear community of beach fronting residences where the vast majority of lots are developed with residential dwellings and relatively few vacant lots exist. Infill development can occur only in instances where roads and other services are already existing and available within the developed community or stretch of beach. Infill development shall not apply to the construction of a shoreline protective device.

INFILTRATION - the downward entry of water into the surface of the soil.

INSTITUTIONAL DEVELOPMENT - any development on public or private land that is intended for public and quasi-public uses and facilities such as emergency communications and services, libraries, museums, maintenance yards, educational (private and public) and religious institutions, community centers, parks and recreational facilities, and governmental facilities including police and fire stations.

INTENSIFICATION OF USE - a change of use, degree of use or increase in size (area) of a use.

KENNEL - an establishment in which three or more dogs or domesticated animals more than four months old are housed, groomed, bred, boarded, trained, or sold.

KITCHEN - a room or space within a building intended to be used for the cooking and preparation of food.

LAND DIVISION - includes subdivisions (through parcel map, tract map, grant deed or any other method), lot line adjustments, redivisions, mergers and certificates of compliance (except as provided in LUP Policy 5.40).

LIFE OF THE PROJECT - shall be one hundred (100) years.

LIMITED DURATION - a period of time which does not exceed a two week period on a continual basis, or does not exceed a consecutive four month period on an intermittent basis;

LIMITED EQUITY COOPERATIVE - a corporation organized pursuant to the California Health and Safety Code and the California Business and Professionals Code.

LIVING AREA - the interior habitable area of a dwelling unit, including basements and attics but does not include a garage or accessory structures.

LOFT - see MEZZANINE.

LOT - a designated parcel, tract or area of land consisting of a contiguous quantity of land in one ownership established by plot, subdivision, or as otherwise permitted by law.

LOT AREA - the total area within the lot lines of a lot, excluding any street rights of way.

LOT, CORNER - a lot or parcel of land situated at the intersection of to or more parkways, highways or streets, which parkways, highways or streets have an angle or intersection measured within said lot or parcel of land of not more than one hundred thirty-five (135) degrees.

LOT, FLAG - a lot or parcel of land taking access by a strip, owner of which lot or parcel of land has fee-simple title to said strip extending from the main portion of the lot or parcel of land to the adjoining parkway, highway or street.

LOT, INTERIOR - a lot or parcel of land other than a corner or flag lot.

LOT, KEY - an interior lot adjoining the rear lot line of a reversed corner lot.

LOT LINE - a boundary line of a lot or a parcel of land.

LOT LINE, FRONT - a line separating the front yard from the parkway, highway or street upon which the yard fronts; or, in the case of a flag lot where the front yard is oriented toward an adjoining lot, the line separating such front yard from said adjoining lot.

LOT LINE, REAR - a lot line which is opposite and most distant from the front lot line. For a triangular or gore-shaped lot the rear lot line shall mean a line ten (10) feet in length within the lot which is parallel to the front lot line, or parallel to the chord of a curved front lot line, and at the maximum distance from the front lot line.

LOT LINE, SIDE - any lot boundary line which is not a front lot line, or a rear lot line.

LOT, REVERSED CORNER - a corner lot, the parkway, highway or street side of which is substantially a continuation of the front lot line of a lot or parcel of land which adjoins the rear lot line of said lot.

LOT, THROUGH - a lot having frontage on two parallel or approximately parallel parkways, highways and/or streets.

LOW INCOME HOUSEHOLD – a household whose income does not exceed eighty (80) percent of the area median income for Los Angeles County, as published and periodically updated by the State Department of Housing and Community Development, pursuant to Section 50079.5 of the California Health and Safety Code.

LOWER INCOME HOUSEHOLDS – include persons and families whose income does not exceed the qualifying limits for lower income families as established and amended from time to time pursuant to Section 8 of the United States Housing Act of 1937. Lower income households include Very-Low Income Households, as defined in Section 50105 of the California Health and Safety Code, and Extremely-Low Income Households, as defined in Section 50106 of the California Health and Safety Code.

MAJOR PUBLIC WORKS AND MAJOR ENERGY FACILITIES - facilities that cost more than one hundred thousand dollars ($100,000) with an automatic annual increase in accordance with the Engineering News Record Construction Cost Index, except for those governed by the provisions of Public Resources Code Sections 30610, 30610.5, 30611 or 30624. Notwithstanding the criteria above, "major public works" also means publicly financed recreational facilities that serve,

affect, or otherwise impact regional or statewide use of the coast by increasing or decreasing public recreational opportunities or facilities.

MANAGER - refers to the Planning Manager of the City of Malibu or his/her designated appointee.

MANUFACTURING - manufacturing activities include apparel and other garment products, furniture and fixtures, printing both commercial and industrial, leather products, pottery, glass blowing and the measuring, analyzing, and controlling instruments, photographic, medical and optical goods and the like.

MATERIAL - any substance including, but not limited to: garbage and debris; lawn clippings, leaves, and other vegetation; biological and fecal waste; sediment and sludge; oil and grease; gasoline; paints, solvents, cleaners, and any fluid or solid containing chemicals.

MEZZANINE - an intermediate level without walls or partitions, placed in any story or room and open to the space below. When the total of any such mezzanine floor exceeds thirty-three and one third (33-1/3) percent of the total floor area in that room, it shall constitute an additional story. The clear height above or below a mezzanine floor shall not be less than 7 feet. No more than one continuous mezzanine may be permitted in any one room. A loft shall be considered a mezzanine.

MOBILE HOME PARK means any area or tract of land where one or more mobile home spaces are rented or leased or held out for rent or lease to accommodate mobile homes used for human habitation.

MOBILE HOME SPACE means any area designated, designed or used for the occupancy of one mobile home on a temporary, semi-permanent or permanent basis.

MODERATE INCOME HOUSEHOLD – a household whose gross income does not exceed one hundred twenty percent (120%) of the area median for Los Angeles County, as published and periodically updated by the State Department of Housing and Community Development, pursuant to Sections 50079.5 and 50052.5 of the California Health and Safety Code.

MOTEL - A facility offering transient lodging accommodations to the public in a group of attached or detached buildings containing guest rooms, some or all of which have a separate entrance leading directly from the outside of the building to automobile parking space conveniently located on the lot or parcel of land, does not provide accessory uses such as restaurants or meeting rooms, and not otherwise open to the public.

MOTOR VEHICLE REPAIR FACILITIES - the use of any building, premises or land in which or upon which the maintenance, servicing, repair, or painting of vehicles is conducted or rendered.

MOTOR VEHICLE SALES FACILITIES - the use of any building, premises or land for the display and sale and/or lease of new or used automobiles, light trucks, vans, trailers, or recreational vehicles and including any warranty repair work and other repair service conducted as an accessory use.

MOTOR VEHICLE WASHING FACILITY - any building or premise or portion thereof used for washing motor vehicles.

MULTI-FAMILY RESIDENCE - a building or portion thereof used for occupancy by two or more families living independently of each other and containing three or more dwelling units.

MUNICIPAL NPDES PERMIT - the "Waste Discharge Requirements for Municipal Storm Water and Urban Runoff Discharges Within the County of Los Angeles" (Order No. 01-182), dated December 13, 2001, issued by the California Regional Water Quality Control Board-Los Angeles Region, and any successor permit to that permit.

MUNICIPAL SEPARATE STORM SEWER SYSTEM or MS4 or STORM DRAIN SYSTEM - streets, gutters, conduits, natural or artificial drains, channels and watercourses, or other facilities that are owned, operated, maintained or controlled by the City and used for the purpose of collecting, storing, transporting, or disposing of storm water.

NARROW RESIDENTIAL LOT - any residentially zoned lot with a width of forty feet (40') or less.

NEIGHBORHOOD-SERVING CONSTRUCTION SERVICES - Construction service companies including, but not limited to, paving, electrical, painting and plumbing contractors which provide construction support services primarily to local residents and business owners. Ancillary uses of such businesses may include outdoor storage and maintenance of equipment and materials used in the course of normal business operations.

NEW DEVELOPMENT - For the purpose of this Chapter "New Development" is defined to mean land disturbing activities; structural development, including construction or installation of a building or structure, creation of impervious surfaces; and land subdivision.

For purposes of implementing the public-access requirements of Public Resources Code Section 30212 and of this chapter, "new development" includes "development" as defined above except for the following:

(a)      Structures destroyed by natural disaster: The replacement of any structure, other than a public works facility, destroyed by a disaster; provided that the replacement structure conforms to applicable existing zoning requirements, is for the same use as the destroyed structure, does not exceed either the floor area, height, or bulk of the destroyed structure by more than ten percent (10%), is sited in the same location on the affected property as the destroyed structure and does not extend the replacement structure seaward on a sandy beach or beachfronting bluff lot. As used in this section, "disaster" means any situation in which the force or forces which destroyed the structure to be replaced were beyond the control of the owners.

(b)      Demolition and reconstruction: The demolition and reconstruction of a single-family residence; provided that the reconstructed residence shall not exceed either the floor area, height or bulk of the former structure by more than ten percent (10%), that the reconstructed residence shall be sited in the same location on the affected property as the former structure, that the reconstructed residence does not block or impede public access, that the reconstructed residence does not extend seaward of the demolished residence on a sandy beach or beachfronting bluff lot and that the reconstructed residence does not include or necessitate a shoreline protective device.

(c)      Improvements: Improvements to any structure which do not change the intensity of its use, which do not increase either the floor area, height or bulk of the structure by more than 10 percent, which do not block or impede access, which do not result in a seaward encroachment by the structure and which do not include or necessitate a new or enlarged shoreline protective device.

(d)      Repair and maintenance: Repair or maintenance activity which, pursuant to Public Resources Code Section 30610(d) and California Code of Regulations Section 13252, requires no permit unless the activity will have an adverse impact on lateral public access along the beach.

(e)      Reconstruction and/or repair of a seawall, revetment, retaining wall or other shoreline protective device: The reconstruction or repair of any shoreline protective device; provided that the reconstructed or repaired shoreline

protective device does not substantially alter the foundation of the protective device, does not result in the replacement of twenty percent (20%) or more of the materials of the existing structure with materials of a different kind, does not extend the protective device seaward of the location of the former structure. As used in this section, "reconstruction or repair" of a seawall shall not include replacement by a different type of structure or other modification in design or construction which results in different or greater impacts to public access or other shoreline resources than those of the existing structure.

NIGHTCLUBS - any bar, cocktail lounge, discotheque, restaurant, or similar activity which includes alcoholic beverage service, dancing and/or entertainment, whether such activity is the principal business use or incidental to a primary use.

NON-PERMANENT STRUCTURES - include, but are not limited to, bleachers, perimeter fencing, vendor tents/canopies, judging stands, trailers, portable toilets, sound/video equipment, stages, platforms, movie/film sets, etc., which do not involve grading or landform alteration for installation

NON-STORM WATER DISCHARGE - any discharge to a Municipal Separate Storm Sewer System that is not composed entirely of storm water.

NPDES PERMIT - any waste discharge requirements issued by the Regional Board or the State Water Resources Control Board as an NPDES Permit pursuant to Water Code §§ 13370 (other than the Municipal NPDES Permit).

NURSERY SCHOOL - a school of pre-elementary school age children which provides controlled activities and/or instruction.

NURSING HOME - a facility licensed to provide full-time convalescence or care for persons with chronic illness or infirmity, or who are unable to care for themselves.

ONSITE - any activity or item that is located on the lot which is the subject of discussion.

OPEN FENCING - a barrier constructed of material which is transparent, such as glass or plastic panels, or wrought iron or other solid material which is ninety percent (90%) open to light and air. See also
OPEN/PERMEABLE, NON-VIEW OBSCURING.

OPEN/PERMEABLE, NON-VIEW OBSCURING - fencing constructed of material which is transparent, such as glass or plastic panels, or wrought iron or other solid material which is ninety percent (90%) open to light and air.

ORCHARD - an area of land devoted to the cultivation of fruit or nut trees.

OUTDOOR DINING - that portion of any restaurant or other eating establishment where seating is provided and food and/or beverages are served, on public or private property, where there is not a roof and walls on all sides of the seating area.

OUTDOOR STORAGE - the keeping in an unroofed area, of any goods, junk, material, merchandise or vehicles in the same place for more than twenty-four (24) hours.

PARKING LOT - land area or a facility for the temporary parking or storage of motor vehicles used personally, for business or for commerce with a lot size of five thousand (5,000) square feet or more, or with twenty-five (25) or more

RJN - 22

parking spaces.

PASSIVE RECREATIONAL USE - any activity normally associated with beach use including, but not limited to, walking, jogging, swimming, sunbathing, picnicking, fishing, and surfing. This does not include use of the beach for organized sports activities, temporary events, or vehicular access, except for emergency or maintenance purposes.

PERMIT - any license, certificate, approval, or other entitlement for use granted or denied by any public agency which is subject to the provisions of this division.

PERMITTED USE - any use allowed in a zoning district and subject to the restrictions applicable to that zoning district.

PERSON - any individual, firm, copartnership, partnership of any kind, joint venture, association, social club, fraternal organization, domestic or foreign corporation, estate, trust, business trust, receiver, syndicate, joint stock company, this and any other county, city and county, municipality, district or other political subdivision, or any other group or combination thereof.

PERSONAL SERVICES - a business which provides a service, such as a beauty salon, a barber shop, hair, nail, massage services and tanning salons.

PHILANTHROPIC, CHARITABLE OR EDUCATIONAL NON-PROFIT ACTIVITY - any activity of a non-commercial, non-political, and non-profit making nature.

PLANNING COMMISSION - refers to the Planning Commission of the City of Malibu.

PLANNING VERIFICATION - a ministerial verification by the Building or Planning Departments to determine for purposes of reconstruction the physical specifications of a structure destroyed or damaged by fire, earthquake, act of war or other calamity.

POLLUTANT - those "pollutants" defined in Section 502(6) of the federal Clean Water Act (33 U.S.C. § 1362(6)) and incorporated by reference into California Water Code § 13373.

PRIMARY BUILDING - the main building or structure in which the principal use of the lot on which it is situated is conducted, as distinguished from a secondary or accessory building or structure.

PRIMARY USE - a principal or dominant use established, or proposed to be established, on a lot or parcel of land, as distinguished from a secondary or accessory use.

PROCESSING - a series of operations, usually in a continuous and regular action or succession of actions, taking place or carried on in a definite manner.

PROFESSIONAL OFFICE - the office of a member of a recognized profession maintained for the conduct of that profession.

PROPERTY LINE - the recorded boundary of a parcel of land.

PROPORTIONATE SHARE OF APPRECIATION – the ratio of the local government's Initial Subsidy as defined to the fair market value of the home at the time of initial sale (e.g. X (*initial subsidy*) / Y (*fair market value*) = Proportionate Share of Appreciation).

PROTECTED ZONE of a tree protected under Section 5.2 of the Malibu LIP shall mean that area within the dripline of the tree and extending at least five feet beyond the dripline, or 15 feet from the trunk of the tree, whichever is greater.

PUBLIC TRUST LANDS - all lands subject to the Common Law Public Trust for commerce, navigation, fisheries, recreation, and other public purposes. Public trust lands include: tidelands, submerged lands, beds of navigable lakes and rivers, and historic tidelands and submerged lands that are presently filled or reclaimed, and which were subject to the Public Trust at any time.

PUBLIC UTILITY SERVICE CENTER - any buildings or premises used for the administration of public utility repair, maintenance and installation crews, including parking for vehicles not to exceed two tons rated capacity, but not including warehouses or storage yards.

PUBLIC UTILITY SERVICE YARD - any building or premises used for the office, warehouse, storage yard or maintenance garage of a public utility, including microwave repeater stations when incorporated as a part of the service yard use.

PUBLIC VIEWING AREA - a location along existing scenic public roads and trails or within public parklands or beaches where there are scenic views of the beach and ocean, coastline, mountains, ridgelines, canyons and other unique natural features or areas.

PUBLIC WORKS - includes the following:

1.      All production, storage, transmission, and recovery facilities for water, sewerage, telephone, and other similar utilities owned or operated by any public agency or by any utility subject to the jurisdiction of the Public Utilities Commission, except for energy facilities.

2.      All public transportation facilities, including streets, roads, highways, public parking lots and structures, ports, harbors, airports, railroads, and mass transit facilities and stations, bridges, trolley wires, and other related facilities.

3.      All publicly financed recreational facilities, all projects of the State Coastal Conservancy, and any development by a special district.

4.      All community college facilities.

QUALIFYING RESIDENT – a person sixty-two (62) years of age or older, or fifty-five (55) years of age or older in a senior citizen housing development, as defined in Section 51.2 of the California Civil Code.

RAINY SEASON - the calendar period beginning November 1 through March 31.

RECREATION CLUB, COMMERCIAL - a commercial enterprise offering the use of indoor or outdoor recreational facilities to the public.

RECREATION CLUB, PRIVATE - an association of persons who are bona fide members, paying regular dues, and organized to provide indoor or outdoor recreational facilities for members and their guests, but not including an association organized primarily to render a service customarily carried on as a commercial enterprise.

RECREATION FACILITIES, NEIGHBORHOOD - indoor and outdoor recreation facilities established by an association of persons who are bona fide members and operate as a nonprofit corporation to provide outdoor recreation facilities for residents in the immediate vicinity and their guests. Such facilities may include a clubhouse, changing rooms and similar subordinate facilities in conjunction with the outdoor recreation activity, but shall not include a restaurant or bar.

REDEVELOPMENT - For the purpose of this Chapter, the term "Redevelopment" means, land-disturbing activity that results in the creation, addition, or replacement of 5,000 square feet or more of impervious surface area on an already developed site. Redevelopment includes, but is not limited to: the expansion of a building footprint; addition or replacement of a structure; replacement of impervious surface area that is not part of a routine maintenance activity; and land disturbing activities related to structural or impervious surfaces. It does not include routine maintenance to maintain original line and grade, hydraulic capacity, or original purpose of facility, nor does it include emergency construction activities required to immediately protect public health and safety.

REGIONAL BOARD - the California Regional Water Quality Control Board-Los Angeles Region.

REGIONAL HOUSING NEEDS ASSESSMENT (RHNA) - the projected housing need by income category for the current planning period pursuant to Government Code Section 65583.2(h), as adopted by the Southern California Association of Governments in accordance with Government Code Section 65584.

RELIGIOUS FACILITIES - churches, temples, or other places used exclusively for religious worship, including customary incidental educational, residential and social activities in conjunction therewith.

REMEDIAL GRADING - grading recommended by a California Licensed Geologist that is necessary to mitigate a geotechnical hazard on a site (including access driveways), such as: (1) repair of a landslide; (2) over-excavation of a building site to remediate expansive or compressible soils; and/or (3) altering a building pad to improve site stability (usually by removing materials and lowering finish grade).

REMODEL - the upgrade of the interior or exterior faces of a building or structure without altering the existing foundation, footprint or building envelope. Remodeling may include the replacement of exterior walls within the limitations described herein and according to the requirements of the Building Code provided that such remodeling can meet the standards for zone clearance or plot plan review.

RESEARCH AND EDUCATION - when used as a permitted use, refers to scientific, teaching, and learning activities consistent with preservation of the resources subject to the research and educational purpose.

RESIDENTIAL CARE FACILITY FOR THE ELDERLY - a housing arrangement chosen voluntarily by persons sixty (60) years of age or over, or their authorized representative, where varying levels and intensities of care and supervision, protective supervision, personal care, or health-related services are provided, based upon their varying needs, as provided in California Health and Safety Code Section 1569.2, as the same may be amended from time to time.

RESIDENTIAL CARE FACILITY, LARGE – any family home or group care facility serving 7 or more persons in need of personal services, supervision or assistance essential for sustaining the activities of daily living or for the protection of the individual, excluding jails or other detention facilities.

RESIDENTIAL CARE FACILITY, SMALL - any family home or group care facility serving 6 or fewer persons in need of personal services, supervision or assistance essential for sustaining the activities of daily living or for the protection of the individual, excluding jails or other detention facilities.

RESIDENTIAL COMMUNITY APARTMENT HOUSE - a residential complex in which an undivided interest in the land either in fee simple or a term of years, is coupled with the right of exclusive occupancy in an apartment located therein.

RESIDENTIAL CONDOMINIUM - an estate in real property consisting of an undivided interest in common in a parcel of real property together with a separate interest in space in a residential complex located on such real property. A residential condominium may include, in addition, a separate interest in other portions of such real property. Such estate may, with respect to the duration of its enjoyment, be either: (1) an estate of inheritance or perpetual estate; (2) an estate for life; or (3) an estate for years, such as a leasehold or a subleasehold.

RESIDENTIAL STOCK COOPERATIVE - a residential complex which is owned, or is to be owned, by a corporation ("cooperative housing corporation") which is formed or availed of primarily for the purpose of holding title to, either in fee simply or for a term of years, improved real property, if all or substantially all of the shareholders of such corporation receive a right of exclusive occupancy in a portion of the real property, title to which is held by the corporation, which right of occupancy is transferable only concurrently with the transfer of the share of shares of stock or memberships in the corporation held by the person having such right of occupancy.

RESTAURANT - a stand-alone facility that sells prepared foods and drinks for consumption, including stationary lunch counters and refreshment stands selling prepared foods and drinks for immediate consumption. (SIC code 5812).

RESTAURANT, CARRY OUT - any restaurant with prepared food or quickly cooked food for consumption onsite at provided seats and tables or for take out. Such restaurants are characterized generally by a limited menu, disposable wrapping for food and rapid turnover in customers.

RESTRICTED UNIT –a dwelling unit that is affordable to very-low, low-, and moderate-income persons.

RETAIL GASOLINE OUTLET - any facility engaged in selling gasoline and lubricating oils.

RIDGELINE, PRIMARY - a hill, ridge or promontory which drops on either side of the top of this landform feature, and includes at least one of the following conditions: (1) forms a distinct part of the skyline when viewed from a public street or highway; or (2) is seen as a distinct and prominent edge against a backdrop of land at least five hundred feet (500′) behind it when viewed from a public street and contains an average slope of at least 3:1.

RIDGELINE, SECONDARY - a hill, ridge, or promontory other than a primary ridgeline, but on which the elevation drops more than ten feet (10′) in one hundred feet (100′) horizontally on either side of the top of this landform feature.

ROOM - an enclosed area which is designed, used or intended to be used as sleeping accommodations for any person(s), and which does not contain a bar sink and/or gas/electrical or water outlets designed, used or intended to be used for cooking facilities except as otherwise specifically provided by the Malibu Zoning Ordinance.

ROOM, GUEST - one which is designed, used or intended to be used as a temporary sleeping accommodations for any person, and which does not contain a bar sink and/or gas, electrical or water outlets designed, used or intended to be used for cooking facilities except as otherwise specifically provided by the Malibu Zoning Ordinance.

SANDY BEACH AREA - includes publicly owned and privately owned sandy areas fronting on coastal waters, regardless of the existence of potential prescriptive rights or a public trust interest.

SCENIC AREA - places on, along, within, or visible from scenic public roads, trails, beaches, and parklands that offer scenic vistas of the beach and ocean, coastline, mountains, canyons and other unique natural features or areas.

SCENIC ROAD - those public roads within the City that traverse or provide views of areas with outstanding scenic qualities, that contain striking view of natural vegetation, geology, and other unique natural features, including the mountains, canyons, ridgelines, beach and ocean.

SCHOOL - any building or part thereof which is designed, constructed or used for education or instruction, whether public or private, in any branch of knowledge.

SEA - the Pacific Ocean and all harbors, bays, channels, estuaries, salt marshes, sloughs, and other areas subject to tidal action through any connection with the Pacific Ocean, excluding nonestuarine rivers, streams, tributaries, creeks and flood control and drainage channels.
SEA CLIFF - a cliff or slope produced by wave action, situated at the seaward edge of the coast or the landward side of the wave-cut platform, and marking the inner limit of beach erosion.

SECOND UNIT - an attached or detached residential dwelling unit which provides complete independent living facilities for one or more persons. It shall include permanent provisions for living, sleeping, eating, cooking, and sanitation on the same parcel as the single family dwelling is situated. The maximum living area of a second unit shall not exceed nine hundred (900) square feet, including any mezzanine or storage space. A second unit may include a garage not to exceed four hundred (400) sq. ft. The square footage of the garage shall not be included in the maximum living area.

SEDIMENT BASIN - a basin constructed to collect and store debris or sediment.

SENIOR CITIZEN HOUSING DEVELOPMENT – a residential development developed, substantially rehabilitated or renovated, and having at least thirty-five (35) dwelling units for senior citizens in compliance with the requirements of Sections 51.3 and 51.12 of the California Civil Code, or a mobile home park that limits residency based on age requirements for housing for older persons pursuant to Sections 798.76 or 799.5 of the California Civil Code.

SENSITIVE FACILITIES - those facilities which may by nature of their occupants be inhibited in their rapid evacuation capabilities, such as nursing homes, senior citizens' housing and other low-mobility uses; and commercial and industrial facilities containing hazardous materials or potentially hazardous operations requiring safe shut-down procedures.

SETBACK - the distance between the parcel line and a building not including permitted projections.

SHADE STRUCTURE - a structure with a temporary or permanent roof or a covering made of or supporting plants or vines which is designed to provide shelter from the heat or glare of the sunlight.

SHALLOW RESIDENTIAL LOT - any residentially zoned lot with a depth of one hundred feet (100') or less.

SINGLE-ROOM OCCUPANCY FACILITY – a structure that provides living units that have separate sleeping areas and may have private or some combination of shared bath or toilet facilities. The structure may or may not have separate or

shared cooking facilities for the residents.

SINGLE-ROOM OCCUPANCY UNIT – a room that is used, intended or designed to be used by no more than two persons as a primary residence, but which lacks either or both a self-contained kitchen or bathroom.

SITE COVERAGE - the horizontal area measured at the outside of the exterior walls of the ground floor of all principal and accessory buildings on a lot.

SITE DESIGN BMP - any project design feature that reduces the creation or severity of potential pollutant sources or reduces the alteration of the project site's natural flow regime.

SOURCE CONTROL BMP - any schedule of activities, prohibition of practices, maintenance procedures, managerial practices or operational practices that aim to prevent storm water pollution by reducing the potential for contamination at the source of pollution.

SPECIAL EVENT - a significant occurrence or happening which is arranged for a particular occasion or purpose.

STAND - a structure for the display and sale of products with no space for customers within the structure itself.

STANDARD URBAN STORM WATER MITIGATION PLAN or SUSMP - the Standard Urban Storm Water Mitigation Plan (SUSMP) approved by the Los Angeles Regional Water Quality Control Board on March 8, 2000, and any updates or amendments approved thereafter by the Los Angeles Regional Water Quality Control Board.

STORM WATER MANAGEMENT PLAN - a plan which shall be required in connection with any new development for the purposes of construction erosion control, runoff detention to control runoff rate to predevelopment levels, and runoff retention or other treatment measures to prevent dry-weather pollution from entering the storm drain system.

STORM WATER RUNOFF - that part of precipitation (rainfall or snowmelt) which travels via flow across a surface to the Municipal Separate Storm Sewer System or receiving waters from impervious, semi-pervious or pervious surfaces. When all other factors are equal, runoff increases as the perviousness of a surface decreases.

STORY - that portion of a building included between the upper surface of any floor and the upper surface of the floor next above, except that the topmost story shall be that portion of a building included between the upper surface of the topmost floor and the roof above. A basement shall not be considered a story if the finished first floor does not exceed 3 feet above the average natural grade of the parcel. An unfinished attic shall not be considered a story. A mezzanine shall be considered a story if it is not open to the floor below, if it contains any enclosed rooms, bathrooms, closets, and the like, or if it contains more than 33-1/3% of the total floor area of the room(s) onto which it opens.

STREAM - is a topographic feature that at least periodically conveys water through a bed or channel having banks. This includes watercourses having a surface or subsurface flow that supports or has supported riparian vegetation.

STREET - a public or private right-of-way, major or secondary highway or alley, whose function is to carry vehicular traffic and/or provide vehicular access to abutting property.

RJN - 28

STRINGLINE RULE - a development standard used to establish beachfront structure setbacks.


STRUCTURAL BMP - any structural facility designed and constructed to mitigate the adverse impacts of storm water and urban runoff pollution (e.g., canopy, structural enclosure). Structural BMPs may include both Treatment Control BMPs and Source Control BMPs.


STRUCTURE - anything construed or erected which requires a fixed location on the ground, or is attached to a building or other structure having a fixed location on the ground.


SUBMERGED LANDS - all lands that lie below the line of mean low tide.


SUPPORTIVE HOUSING – a building or buildings configured as rental housing development with no limit on length of stay, that is occupied by a "target population", and that is linked to on- or off-site services that assist the supportive housing resident in retaining the housing, improving his or her health status, and maximizing his or her ability to live and, when possible, work in the community. Supportive housing is a residential use subject only to the same regulations and procedures that apply to other residential uses of the same type in the same zone.


TARGET POPULATION – persons or families who are "homeless" (as that term is defined by Section 11302 of Title 42 of the United State Code), or who are "homeless youth" (as that term is defined by paragraph (2) of subdivision (e) of Section 11139.3 of the Government Code). Individuals and families currently residing in supportive housing meet the definition of "target population" if the individual or family was "homeless" as that term is defined by Section 11302 of Title 42 of the United States Code, when approved for tenancy in the supportive housing project in which they currently reside.


TEMPORARY EVENT - is: (1) an activity or use that constitutes development as defined in Section 30106 of the Coastal Act but which is an activity or function which is or will be of limited duration and involves the placement of non-permanent structures such as bleachers, vendor tents/canopies, portable toilets, stages, film sets, etc., and/or involve exclusive use of sandy beach, parkland, filled tidelands, water, streets, or parking areas in temporary facilities, public or private buildings or open spaces, or outside of buildings which are otherwise open and available for general public use; or (2) an activity as defined in section (1) that involves any commercial component such as: admission fee, renting of facility, charging for valet parking or shuttle service and/or public advertising.


TEMPORARY STRUCTURE - a structure without any foundation or footings, and which is removed when the designated time period, activity, or use for which the temporary structure was erected has ceased.


TERRACE - an earthen embankment, a channel, or combination ridge and channel constructed across the slope.


THEATER - an enclosed building used for public assembly and/or entertainment, including sports events, theatrical performances, concerts and recitals, circuses, stock shows and conventions. This definition shall include auditorium.


TIDELANDS - all lands which are located between the lines of mean high tide and mean low tide.


TOTAL DEVELOPMENT SQUARE FOOTAGE - the calculation of the interior space of the primary and accessory structures (including interior and exterior walls). Accessory structures shall include, but are not limited to, guest houses,

garages, barns, sheds, gazebos, cabanas. Decks, terraces and balconies shall not be included in total square footage calculations when they are a part of a primary or accessory structure and are open on all sides.

TRANSITIONAL HOUSING – a building or buildings configured as rental housing development occupied by the "target population", but operated under program requirements that call for termination of assistance and recirculation of the assisted unit to another eligible program recipient at some predetermined future point in time, which shall be no less than six months. Transitional housing is a residential use subject only to the same regulations and procedures that apply to other residential uses of the same type in the same zone.

TREATMENT - the application of engineered systems that use physical, chemical, or biological processes to remove pollutants. Such processes include, but are not limited to, filtration, gravity settling, media adsorption, biodegradation, biological uptake, chemical oxidation and UV radiation.

TREATMENT CONTROL BMP - any engineered system designed to remove pollutants by simple gravity settling of particulate pollutants, filtration, biological uptake, media adsorption or any other physical, biological, or chemical process.

TREE - a plant having at least one well defined stem or trunk and normally attaining a mature height of at least fifteen feet (15′), and having a trunk that shall be kept clear of leaves and branches at least six feet (6′) above grade at maturity.

TREE, 15-GALLON - a fifteen (15) gallon container tree shall be no less than one inch caliper and at least six feet (6′) in height above grade at the time of planting.

TREE, 24-INCH BOX - a twenty-four inch (24″) box tree shall be no less than one and three quarters inch (1-3/4″) caliper and at least seven feet (7′) in height above grade at the time of planting.

TREE REMOVAL - the destruction or displacement of a tree by cutting, bulldozing, or other mechanical or chemical method which results in physical transportation of the tree from its site and/or death of the tree.

TRELLIS - A frame supporting open latticework, typically used for training vines and other climbing plants.

UPLAND LIMIT OF A WETLAND - is: (1) the boundary between land with predominately hydrophytic cover and land with predominately mesophytic or xerophytic cover; (2) the boundary between soil that is predominately hydric and soil that is predominately nonhydric; or (3) in the case of wetlands without vegetation or soils, the boundary between land that is flooded or saturated at some time during years of normal precipitation, and land that is not.

URBAN RUNOFF - surface water flow produced by non-storm water resulting from residential, commercial, and industrial activities involving the use of potable and non-potable water.

USE - the purpose or activity for which land or a structure is designed, arranged, intended, occupied or maintained.

VERY-LOW INCOME HOUSEHOLD – a household whose income does not exceed fifty (50) percent of the area median income for Los Angeles County, as published and periodically updated by the State Department of Housing and Community Development, pursuant to Section 50105 of the California Health and Safety Code.

VINEYARD - a plantation of grapevines where wine grapes are produced.

WALLS - see FENCES.

WAREHOUSING - the storage of materials in a warehouse or terminal, where such materials may be combined, or separated for transshipment or storage purposes but the original material is not chemically or physically changed.

WETLAND - is defined by Section 30121 of the Coastal Act as lands within the coastal zone which may be covered periodically or permanently with shallow water and include saltwater marshes, freshwater marshes, open or closed brackish water marshes, swamps, mudflats, and fens. The definition of wetland is further detailed by Section 13577 (b)(1) of the California Code of Regulations as land where the water table is at, near, or above the land surface long enough to promote the formation of hydric soils or to support the growth of hydrophytes, and shall also include those types of wetlands where vegetation is lacking and soil is poorly developed or absent as a result of frequent and drastic fluctuations of surface water levels, wave action, water flow, turbidity or high concentrations of salts or other substances in the substrate. Such wetlands can be recognized by the presence of surface water or saturated substrate at some time during each year and their location within, or adjacent to vegetated wetlands or deep-water habitats.

WHEEL STOP - a physical barrier sufficient in size and shape to prevent the movement of automobiles or other vehicles over or past such barrier.

WHOLESALE - establishments or places of business primarily engaged in selling merchandise to retailers, to industrial, commercial, institutional, or professional business users, or to other wholesalers; or acting as agents or brokers and buying merchandise for, or selling merchandise to, such individuals or companies.

YARD - an open space on the same lot or parcel of land, other than a court, unoccupied and unobstructed from the ground upward, except as otherwise permitted by the Malibu Zoning Ordinance.

YARD, FRONT - a yard extending across the full width of the lot or parcel of land. The depth of a required front yard shall be a specified horizontal distance between the highway line of the parkway, highway or street on which the property fronts, and a line parallel thereto on the lot or parcel of land, except as otherwise provided for a flag lot. On corner lots, the front yard shall be located across the narrower frontage of the lot. A yard shall not be deemed a front yard if there is no right of access of any kind, pedestrian or vehicular, from the adjoining street.

YARD, REAR - a yard extending across the full width of the lot or parcel of land. The depth of the required rear yard shall be a specified horizontal distance between the rear lot line and a line parallel thereto on the lot or parcel of land.

YARD, SIDE, CORNER - a yard bounded by a parkway, highway or street, extending from the required front yard, or the highway line on which the property fronts where no front yard is required, to the required rear yard or to the rear lot line where no rear yard is required. The width of such required side yard shall be a specified horizontal distance between the highway line of the parkway, highway or street on which the property sides, and a line parallel thereto on the lot or parcel of land.

YARD, SIDE, INTERIOR - a yard extending from the required front yard, or the highway line on which the property fronts where no front yard is required, to the required rear yard or to the rear lot line where no rear yard is required on other than a corner side yard. The width of a required interior side yard shall be a specified horizontal distance between each such side lot line parallel thereto on the lot or parcel of land.

ZERO LOT LINE - the location of a building on a lot in such a manner that one or more of the building's sides rests directly on a lot line.

ZONING ORDINANCE – Title 17 of the City of Malibu Municipal Code. (Ord. 461 § 6, 2020; Ord. 449 § 4, 2019; Ord. 393 § 4, 2015; Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

---

View the mobile version.

Malibu Local Coastal Program

Up          Previous          Next          Main                    Search          Print          No Frames
        Local Implementation Plan
            CHAPTER 3—ZONING DESIGNATIONS AND PERMITTED USES

## 3.15. SIGNS

### 3.15.1  Purpose

These sections are intended to implement the City's land use and environmental goals, policies and objectives, with particular regard to maintaining a city that is visually attractive and to preserving and enhancing public access to the shoreline, inland trails and public parks, and the visual qualities of the community's scenic areas, streets and highways . Standards are provided to safeguard the life, health, property, and public welfare by regulating the design, quality of materials and construction, illumination, location and maintenance of all signs, sign structures and billboards, while attempting to provide functional flexibility and create an incentive to promote good design. (Ord. 373 § 3, 2013)

### 3.15.2  Goals

This Chapter shall apply to all signs within the City. The goals of these regulations include the following:

    A.     To preserve and enhance the unique character and visual appearance of the City.

    B.      To assure proper expression through visual communications involving signs that are compatible with the character and environment of this community.

    C.      To promote fairness in competition and retain identity in the business community while recognizing the importance of well designed business signs.

    D.     To enhance the visual quality of the City's scenic area, roads, and streets.

    E.     To recognize the integral part played by signs in the overall appearance of the City.

    F.     To reduce possible traffic and safety hazards by prohibiting signs that are distracting to motorists.

    G.     To recognize the functions and importance of signs for businesses and the benefit of well designed business signs to the community as a whole.

    H.     To provide guidance and direction for sign users and sign designers as to what constitutes appropriate signs in the City.

    I.      To establish standards that will encourage business signs to be used for the purpose of business identification.

    J.      To protect and provide for public access to and along the shoreline, inland trails and public parklands.

RJN - 33

K.     To develop a uniform signage program to assist the public in locating and recognizing shoreline and trail access points. In areas containing environmentally sensitive habitat or safety hazards, signs may be posted in English and in Spanish describing the habitat or safety hazard once the accessway or trail is opened by a public agency or private association. (Ord. 373 § 3, 2013)

### 3.15.3   Prohibited Signs

Except for those signs allowed under the provisions of Section 3.15.4 (E) of the Malibu LIP, "Special permits," the following signs are prohibited:

A.     Outdoor advertising displays, structures or signs.

B.     Portable signs.

C.     Exposed neon, flashing or scintillating signs, except for public service time and temperature signs, which shall not be flashing, animated or revolving in nature.

D.     Revolving signs.

E.     Devices dispensing bubbles and free floating particles of matter.

F.     Any notice, placard, bill, card, poster, sticker, banner, sign, advertising or other device affixed or attached to or upon any public street, walkway, crosswalk, other rights-of-way, curb, lamppost, hydrant, tree, telephone booth or pole, lighting system or any fixture of the police or fire alarm system.

G.     Devices projecting or otherwise producing the image of an advertising sign or message on any surface or object.

H.     Projecting signs.

I.     Signs which project or encroach into any existing or future street right-of-way.

J.     Automatic changing signs or electronic message center signs, except for public service time and temperature signs, and public safety signs such as changeable traffic message signs.

K.     Streamers, banners, balloons, flares, flags (other than national, state, or local government flags), pennants, propellers, twirlers, and similar attention-getting display or device with the exception of the following:

1.     Holiday decorations, in season, displayed for an aggregate period not exceeding sixty (60) days in any one (1) calendar year, except no advertising of the business or products shall be permitted.

2.     Grand opening and special event displays approved by the Manager in the manner hereinafter provided.

RJN - 34

L.      Except as hereinafter provided, freestanding or pole signs, except for onsite directional signs.

M.      A vehicle related portable freestanding sign or any sign placed within, affixed or attached to any vehicle or trailer on a public right-of-way, or on public or private property, for the purpose of advertising an event or attracting people to a place of business, unless the vehicles or trailer is used in its normal business capacity and not for the primary purpose of advertising an event or attracting people to a place of business.

N.      Signs or sign structures which by color, wording or locations resemble or conflict with traffic control signs or devices.

O.      Signs that create a safety hazard by obstructing the view of pedestrian or vehicular traffic.

P.      Sign structures and supports no longer in use, for a period of sixty (60) days by the owner, tenant, or lessee.

Q.      Signs painted directly on an exterior wall, fence, fascia or parapet.

R.      Signs that display a message or graphic representation that is lewd, indecent, or offensive to public morals.

S.      Signs for the purpose of commercial advertising created by the arrangement of vegetation, rocks, or other objects such as on a hillside visible to pedestrians or motorists.

T.      Roof signs.

U.      Combination signs.

V.      Signs which are enacted after this date that do not conform to the provisions of these section are prohibited.

W.      Signs advertising off-site non-coastal related uses or services shall be prohibited in public beaches and parks.

X.      Signs which restrict public access to State tidelands, public vertical or lateral access easement areas, or which purport to identify the boundary between State tidelands, and private property shall not be permitted.

Y.      Signs which obstruct or degrade public views to scenic areas from public viewing areas and scenic roads are prohibited.

Z.      New billboards. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

## 3.15.4   Permit Requirements and Procedure

A.      Application. No person shall place, erect, modify, alter or repaint, or permit the placement, erection, modification, alteration or repainting of any sign, unless otherwise specifically exempted by this Chapter, without first obtaining a sign permit in accordance with the provisions of this section. The application for such sign permit shall be made on the form provided by the Planning Department and shall be accompanied by the required fee. Such application shall set forth and contain the following information and materials:

RJN - 35

1.      The location and size of any existing or proposed buildings or structures on the property, which are or will be under the ownership or control of the applicant.

2.      The location of off-street parking facilities, including major points of entry and exit for motor vehicles where directional signs are proposed.

3.      The position of the proposed sign and its relationship to existing or proposed adjacent buildings and structures which are or will be under the ownership or control of the applicant.

4.      The proposed design, size, exact colors, materials and location of the sign or sign structure.

5.      The method of attachment to any structure.

6.      A statement showing sizes and dimensions of all other signs existing on the property under the ownership or control of the applicant.

7.      A statement showing the size and color relationships of such sign or sign structure to the appearance and design of existing or proposed buildings and structures on the property.

8.      Photographs of all sides of any building or renderings of proposed buildings.

9.      Such other information as the Planning Department may require to secure compliance with this Chapter.

B.      Review. An application for a sign permit for the placement or erection of a new sign or the modification, alteration or repainting of an existing sign shall be reviewed by the Manager. The Manager shall approve the application if the Manager finds that such application satisfies the criteria set forth in subsection C of this Chapter. Any decision made by the Manager may be appealed in accordance with the provisions of the Malibu Zoning Ordinance.

C.      Criteria. The following criteria shall be used in reviewing an application for a sign permit:

1.      That any business sign is necessary for the applicant's enjoyment of substantial trade and property rights;

2.      That the sign is consistent with the certified Local Coastal Program, general plan and the provisions of the Municipal Code;

3.      That the sign is not detrimental to the public health, safety, or welfare;

4.      That the size, shape, color, and placement of the sign is compatible with the building it identifies;

5.      That the size, shape, color, and placement of the sign is compatible with the neighborhood and other lawful signs in the area;

6.      That both the location of the proposed sign and the design of its visual elements (lettering, words, figures, colors, decorative motifs, spacing, and proportions) are legible under normal viewing conditions prevailing where the sign is to be installed;

7.      That the location and design of the proposed sign does not obscure from view or unduly detract from existing or adjacent signs;

8.      That the location and design of the proposed sign, its size, shape, illumination, and color are compatible with the visual characteristics of the surrounding area so as not to detract from or cause depreciation of the value or quality of adjacent properties; and

9.      That the location and design of a proposed sign in close proximity to any residential district does not adversely affect the quality or character of such residential area.

10.     Signs shall be designed and located to minimize impacts to scenic areas from scenic roads and public viewing areas.

11.     Signs approved as part of commercial development shall be incorporated into the design of the project and shall be subject to height and width limitations to ensure that signs are visually compatible with surrounding areas.

D.      Exemptions to sign permit requirement.

1.      The following signs, if not illuminated, shall be permitted without the requirement of a sign permit in all land use zones:

a.      One (1) identification sign not exceeding two (2) square feet in area displaying only the name and/or address of the owner, occupant or use, except that agricultural uses may have one (1) identification sign not exceeding six (6) square feet in area.

b.      Directional or safety signs required by law.

c.      One (1) each national, state, and local governmental flag properly displayed upon a maximum of one (1) per pole, not to exceed twenty-eight (28) feet in height.

d.      Holiday decorations, in season, displayed for an aggregate period not exceeding sixty (60) days in any one (1) calendar year.

e.      Religious, charitable, civic, homeowners association, educational or cultural posters, affixed to a building wall or window area, not exceeding sixteen (16) square feet in area which are installed in a temporary condition.

f.      Utility and telephone pay station signs.

g.     Official traffic, fire and police related signs, temporary traffic control signs used during construction, utility facilities and substructure location and identification signs and markers required to protect said facilities, and other signs and markers required or authorized by the City of Malibu, the State Department of Transportation, or any other public agency.

h.     Notices required to be posted by law.

i.     Signs for public or quasi-public uses. Directional and public convenience signs for public and quasi-public uses may be permitted on public property. The design of such signs shall conform to standard directional sign specifications promulgated by the Manager and approved by the planning commission. The total number of signs allowed shall be based on the minimum number necessary for adequate public identification as determined by the Manager.

j.     Signs indicating the location of or directions to public access to the shoreline, trails or parklands.

2.     Residential land use districts.

a.     Nameplates. Each residential dwelling is permitted one (1) nameplate per street frontage indicating the names of the residence/occupants and/or the street address of the residence. The sign shall not exceed two (2) square feet in area.

b.     Agricultural uses. Each agricultural use is permitted one (1) unilluminated sign indicating the name and address of such use. Such sign shall not exceed six (6) square feet in area and if located on a fence or stake, shall not be more than six (6) feet in height.

c.     Real estate advertising signs. One (1) unilluminated, double-faced real estate advertising sign is permitted, not to exceed six (6) square feet in area and six (6) feet in height. Such sign shall contain information restricted to the sale or rental of the premises on which located. Such sign shall be situated no less than five (5) feet from the inside line of the sidewalk, or if there is no sidewalk, from the property line. Such sign shall remain on the premises only during the period of time that the premises are being offered for sale and in any event shall be removed seven (7) days after the property is sold or rented or the offer for sale or rent is terminated.

d.     Open house signs. During the period when real estate is offered for sale or rent and while a salesperson is physically present on the premises, a sign indicating that an open house is being conducted is permitted. the sign shall not exceed three (3) square feet in area; and if located on a stake, no part of the sign shall exceed four (4) feet above ground level. Off-site directional signs may be permitted for an open house, subject to the following provisions:

i.     Such signs shall not exceed three (3) square feet in area;

ii.     No more than two pole flags not exceeding two square feet or five feet in height shall be used;

iii.     Such signs shall be located on private property only;

iv.     Such signs shall be allowed only during daylight hours;

      v.      Such signs shall be located not less than five (5) feet from the inside line of the sidewalk or, if there is no sidewalk, from the property line.

    e.      Signs for special events including temporary events exempt from CDP requirements. Temporary signs not exceeding sixteen (16) square feet in area pertaining to events of civic, philanthropic, educational or religious organizations may be permitted provided that such signs are posted for no more than thirty (30) days prior to and seven (7) days after such event.

    f.      Garage sale signs. One (1) non-illuminated double-faced sign is permitted during the time of a garage sale. Such sign shall not exceed six (6) square feet in area and, if located on a fence or stake, shall not be more than six (6) feet in height. In addition, off-site directional signs may be permitted during the same period subject to the following provisions:

      i.      Such signs shall not exceed three(3) square feet in area.

      ii.      Such signs shall be located on private property only; and

      iii.      Such signs shall be limited to four (4) in number.

3.      Multiple residential districts

    a.      Purpose. In authorizing signs for this zone, it is recognized that larger residential complexes and other permitted uses require identification as separate identities. The intent of these regulations is to strive for a single sign per complex or use to eliminate clutter and to promote compatibility, proportion, simplicity and sign effectiveness.

    b.      Signs - Apartments. One (1) monument identification sign not exceeding forty-eight (48) square feet in area, including the base, and six (6) feet in height may be erected on the public street frontage upon which the apartment complex has access. Such sign shall be set back a minimum of five (5) feet from any property line. In addition, a directory sign not exceeding one (1) square foot of sign area per apartment and five (5) feet in height may be installed on each building wall facing a public street upon which the apartment complex has access.

    c.      Signs - Condominiums. One (1) monument identification sign not exceeding forty-eight (48) square feet in area, including the base, and six (6) feet in height may be erected on each public street frontage upon which the complex has public access. Such signs shall be set back from any property line at least five (5) feet. In addition, interior directional signs which are visible from any public right-of-way, may be approved by the Manager to identify special elements of such complexes such as clubhouses and other common area facilities provided that such signs do not exceed six (6) square feet in area and four (4) feet in height. Interior directional signs not visible from any public right-of-way shall not be subject to the requirements of this paragraph.

    d.      Other permitted uses. For each nonresidential use not more than one (1) monument identification sign per public street frontage upon which such use has public access may be erected to identify the use provided that such sign does not exceed forty-eight (48) square feet in area, including the base, and six (6) feet in height. Such signs shall be set back a minimum of five (5) feet from any property line.

e.      Real estate advertising signs. One (1) real estate sign is permitted per unit being offered for sale, lease or rent. Such signs shall not exceed six (6) square feet in area and six (6) feet in height, and shall be designed and located in a manner approved by the Manager. Such sign shall be removed with seven (7) days after the property is sold or rented or the offer for sale or rent is terminated. Property shall be deemed to be sold upon the close of escrow.

f.      Signs for special events. Temporary signs not exceeding sixteen (16) square feet in area pertaining to events of civic, philanthropic, educational or religious organizations may be permitted provided that such signs are posted for no more than thirty (30) days prior to and seven (7) days after the event.

E.      Special permits. Nothing contained in this Chapter shall prohibit the City from granting a temporary special permit or otherwise permitting, on such terms as it deems proper, sign or like advertising pertaining to any civic, patriotic or special event of general public interest provided that the council finds that such signs or advertising will not be materially detrimental to the public health, safety or welfare, nor harmful to adjacent properties or uses. The Manager may grant minor special permits. Said signs shall be limited to a maximum of two (2) per parcel and shall not exceed sixteen (16) square feet in size. Said signs shall be located a minimum of ten (10) feet from any public right-of-way. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

## 3.15.5   General Provisions

A.      Entitlements strictly construed. Since the regulations provided by this Chapter are established to protect and promote the public health, safety, and general welfare, any sign entitlement authorized hereunder shall be strictly construed to further the purposes of this Chapter.

B.      Sign integration requirement. All signs shall be designed as an integral part of the total building design.

C.      Sign orientation. All signs shall face a public or private right-of-way, either on or abutting the property upon which such signs are located.

D.      Number of colors. All permanent signs shall contain no more than four (4) different colors. For the purposes of this provision, white and black shall be considered colors. Different shades shall be considered separate colors. A logo is not subject to the four-color limitation.

1.      Shopping Center Signs. All signs in shopping centers shall comply with each of the following.

a.      Each sign shall contain one or two of the same four (4) colors as every other sign throughout the center.

b.      All sign components shall have the same, subdued and uniform background in terms of color, illumination and material.

c.      All lettering shall be the same style and color as other signs in the center.

d.      A logo shall not be larger than 25 percent of the sign area and is not subject to the four-color limitation.

e.      The sign structure and any related supports shall be the same color and material throughout the center.

E.      Sign copy. Not more than twenty-five (25) percent of the total area of any sign shall include descriptive wording which is not a part of the name of the business.

F.      Types of materials. The types of materials for sign structures shall, if possible and practicable, be similar to or the same as materials used in the related buildings.

G.      Illumination of signs. Unless otherwise prohibited by this Chapter, signs may be illuminated subject to the approval of the Manager to ensure that such illumination does not interfere with the use and enjoyment of adjacent properties or create any public safety hazards. The approval of any illuminated sign shall not be final until thirty (30) days after installation during which period the Manager may order the dimming of any illumination found to be excessively brilliant, and no sign approval shall be valid until such order has been carried out to the satisfaction of the Manager. Illumination shall be considered when it prevents perception of objects or building beyond or in the vicinity of the sign. In no case shall an illuminated sign or lighting device be so placed or directed as to permit the beams and/or illumination therefrom to be directed or beamed upon a public street, walkway, or adjacent properties so as to cause glare or reflection that may constitute a traffic or safety hazard or interfere with the use and enjoyment of adjacent properties. Except for automated teller machines, no sign shall be illuminated after 11:30 p.m. or close of business, whichever occurs last.

    1.      In no event shall the following limits be exceeded:

        a.      Four (4) 430-milliamp tubes for fluorescent internal lighting,

        b.      30-milliamp for neon internal lighting,

        c.      Two (2) 40-watt floods for external lighting.

H.      Obstruction of public passage. No signs shall be installed so as to obstruct any window, door, fire escape or other emergency exit of any building.

I.      Required information on signs. All permanent signs approved under these regulation shall have the name of the maker, the date of installation and the city sign permit number legibly placed on the lower right hand corner of the face of the sign in a conspicuous place. As an alternative, such information may be placed on the base of the sign at a location visible and readable from the adjacent public or private right-of-way.

J.      Maintenance of signs. All signs shall be maintained in a neat and attractive, well-repaired condition. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

### 3.15.6   Signs Subject to Permit

The sign entitlements provided by this section shall be considered the maximum permitted sign entitlements under the Malibu LIP. Such sign entitlements may be reduced as a condition of approval for the sign permit for a particular sign or signs if necessary to satisfy the sign criteria set forth in the Malibu LIP.

**RJN – 41**

A.      Commercial Land Use Districts.

1.      Purpose. The purpose of sign regulation in the commercial and business land use zones is to limit the number of signs per complex to eliminate clutter and to promote compatibility, proportion, simplicity and sign effectiveness.

2.      Basic sign entitlement- Business park and retail uses. Each separate business shall be limited to one (1) primary sign integrated into the design of the building. Accessory signs shall be used only to improve the effectiveness of the sign program in relationship to the mass of the building or to indicate legitimate accessory uses. The signs permitted under this paragraph 2 shall be referred to as the "basic sign entitlement." Except as other provided by this Chapter, the following sign area limitations shall apply:

a.      The total aggregate area of a primary sign and accessory signs for any business in a building located within one hundred (100) feet of any public or private right-of-way shall not exceed one (1) square foot of sign area for each foot of primary building frontage. In no event, however, shall sign area exceed fifty (50) square feet and such sign shall be located on primary frontage. In the event that one side of the building does not abut a street and exceeds one hundred twenty-five (125) feet in length, there shall be permitted a total of one (1) secondary sign on the building which shall not exceed twenty-five (25) square feet in sign area. The secondary sign may be increased up to fifty (50) square feet in lieu of a primary sign. Such sign shall advertise solely the name of the business center or primary tenant. No secondary sign shall be illuminated. Unless otherwise approved by the Planning Commission, no signs shall be closer than six (6) feet from any other sign permitted under this Chapter. The maximum of any one dimension shall not exceed twenty (20) percent of the building wall, or thirty (30) feet, whichever is less.

b.      The total aggregate area of a primary sign and accessory signs for any business in a building located more than one hundred (100) feet of any public or private right-of-way shall not exceed one (1) square foot of sign area for each foot of primary building frontage. In no event, however, shall such sign area exceed seventy (70) square feet and such sign shall be located on the primary frontage. In the event that one (1) side of the building does not abut a street and exceeds one hundred twenty-five (125) feet in length, there shall be permitted a total of one (1) secondary sign on the building which shall not exceed thirty-five (35) square feet in sign area. The secondary sign may be increased up to seventy (70) square feet in lieu of a

primary sign. Such sign shall advertise solely the name of the business center or primary tenant. No secondary sign shall be illuminated.

c.      Unless otherwise approved by the Planning Commission, no signs shall be closer than six (6) feet from any other sign permitted under this Chapter. The maximum of any one dimension shall not exceed twenty (20) percent of the building wall, or thirty (30) feet, whichever is less.

d.      For a single business totally occupying a commercial building, which is not part of a larger complex, project, center or park, or an outdoor display; and within the limitations of the provisions of subparagraphs a and b, above, a freestanding monument sign is permitted, subject to the following standards:

i.      The sign shall be a maximum of forty-eight (48) square feet in area, including the base.

ii.      The sign shall have a maximum height of six (6) feet.

iii.     The sign shall be located a minimum of five (5) feet from any public or private right-of-way.

iv.     The maximum length of any side of the sign shall not exceed two (2) times the dimension of any other side.

e.     Major tenants in shopping centers which have a frontage greater than one hundred (100) feet are permitted to have a maximum sign area of two hundred (200) square feet.

f.     Business maintained exclusively on the second floor of a two (2) story building may be allowed up to ten (10) square feet of sign area adjacent to the first floor entrance. Second floor businesses sharing a common entrance with one (1) or more first floor businesses shall be limited to a ten-square-foot directory sign at the first floor entrance.

3.     Basic sign entitlement - Office uses. Office buildings shall be limited to one (1) primary sign solely to identify the name of the building, integrated into the design of the building. The signs permitted under this paragraph 3 shall be referred to as the "basic sign entitlement." Except as otherwise provided by this Chapter, the following sign area limitations shall apply.

a.     The total aggregate area of a primary sign for any office building located within one hundred (100) feet of any public or private right-of-way shall not exceed one (1) square foot of sign area for each foot of primary building frontage. In no event, however, shall such sign area exceed fifty (50) square feet and such sign shall be located on the primary frontage. In the event that one side of the building does not abut a street and exceeds one hundred twenty-five (125) feet in length, there shall be permitted a total of one secondary sign on the building which shall not exceed twenty-five (25) square feet in sign area. The secondary

sign may be increased up to fifty (50) square feet in lieu of a primary sign. Such sign shall advertise solely the name of the office center or primary tenant. No secondary sign shall be illuminated. Unless otherwise approved by the Planning Commission, no signs shall be closer than six (6) feet from any other sign permitted under this Chapter. The maximum of any one dimension shall not exceed twenty (20) percent of the building wall, or thirty (30) feet, whichever is less. The maximum height of the sign shall be determined by the Manager.

b.     The total aggregate area of a primary sign and accessory signs for a building located more than one hundred (100) feet of any public or private right-of-way shall not exceed one (1) square foot of sign area for each foot of primary building frontage. In no event, however, shall such sign area exceed seventy (70) square feet and such sign shall be located on the primary frontage. In the event that one side of the building does not abut a street and exceeds one hundred twenty-five (125) feet in length, there shall be permitted a total of one (1) secondary sign on the building which shall not exceed thirty-five (35) square feet in sign area. The secondary sign may be increased up to seventy (70) square feet in-lieu of a primary sign. Such sign shall advertise solely the name of the office center or primary tenant. No secondary sign shall be illuminated. Unless otherwise approved by the planning commission, no signs shall be closer than six (6) feet from any other sign permitted under this Chapter. The maximum of any one dimension shall not exceed twenty (20) percent of the building wall, or thirty (30) feet, whichever is less. The maximum height of the sign shall be determined by the Manager.

c.     In lieu of a sign on the building as specified in (a) and (b) above, an office building is permitted to have a freestanding monument sign. Said sign shall be a monument sign not exceeding forty-eight (48) square feet in area, including the base, and a maximum of six (6) feet from any public right-of-way and shall be used solely to identify the name of the office building.

4.       Frontage on two or more streets. A business located in a building having frontage on more than one (1) public right-of-way may use the basic sign entitlement on one (1) frontage, and one-half of the allowance on the second public frontage. Said allowance shall only be utilized on the frontage on which the allowance is based. For the purposes of this paragraph, frontage shall include any entrance or exit to the premises upon which the subject business is located from a public right-of-way even though the subject business does not actually front such right-of-way. In addition, a business with a public entrance on a secondary frontage on a private right-of-way may have a sign located on such frontage which does not exceed ten (10) square feet in area.

5.       Commercial and business complex, center or park. In addition to the basic sign entitlement, any commercial and business complex, center or park which has a common name and is in excess of two (2) acres in area is permitted one (1) complex identification sign per one thousand (1,000) feet of public right-of-way. Said sign shall be a monument sign not exceeding forty-eight (48) square feet in area, including the base, and a maximum of six (6) feet in height. Such signs shall be set back a minimum of five (5) feet from any public right-of-way and shall be used solely to identify the complex, center or park. Any commercial and business complex, center or park, in which buildings are located fifty (50) feet or more from public right-of-way, shall be allowed one (1) address monument sign, identifying solely the address of the property, per main driveway, not to exceed a total of one (1) sign per five hundred (500) feet of public right-of-way. Address monument signs shall not exceed a total of one (1) sign per five hundred (500) feet of public right-of-way. Address monument signs shall not exceed sixteen (16) square feet in area, including the base, and shall not exceed five (5) feet in height, and shall be set back a minimum of five (5) feet from any public right-of-way. Complex identification signs and address monument signs may be combined, provided that the combined complex/address sign not exceed sixteen (16) square feet in area, including the base, and shall not exceed five (5) feet in height, and shall be set back a minimum distance of five (5) feet from any public right-of-way.

6.       Early review. An application for the first new sign in a commercial or business complex, center or park shall be accompanied by a sign program for the entire complex, center or park in order that all future signs are uniform and consistent with the requirements of this Chapter.

7.       Prohibited locations. No signs shall be located in such a manner as to face in the direction of or be visible to property in a residential district when such sign would be less than two hundred (200) feet from such residential property unless such sign faces and is parallel to a public right-of-way.

8.       Second-story businesses. Businesses maintained exclusively on the second floor of a two-story building may be allowed up to ten (10) square feet of the sign area adjacent to the first floor entrance.

9.       Signs for pedestrian traffic. Where the principal sign for a business is located so that it cannot be seen by pedestrian traffic, an identification sign, in addition to that otherwise allowed under this Chapter, is permitted. Such sign shall be no larger than three (3) square feet per side and shall be designed and located so as to not distract from the appearance of the building or violate the purposes of this Chapter.

10.      Signs within window areas. Informational signs not to exceed a maximum of five (5) square feet of the window area of a business may be used. Such signs shall be located on the inside of the window and shall not require a sign permit, and shall not be used for the name of the business in excess of twenty (20) percent of said area.

a.       Sale/special event signs. During the period of time that a sale of goods or services is being conducted, one (1) sale sign per window located on the inside of such window is allowed on each public street frontage. Such sign shall be in addition to the total authorized sign area but shall not exceed twenty-five (25) percent of the total window area. Said sign shall be compatible in terms of colors with the

permanent signs, except fluorescent color shall be prohibited. Said sale/special event sign shall be limited to a maximum fourteen-day period, not to exceed a total of four (4) said events per year.

    b.    Listing of business associates. In addition to the basic sign entitlement, each separate business shall be allowed, without a sign permit, lettering on or behind windows facing the public view indicating the owners, operators, or business associates exercising the use, provided that such lettering shall be enclosed within a single area and shall not exceed a total of three (3) square feet.

    c.    Use of attraction boards by theaters. In addition to the basic sign entitlement, one (1) attraction board to advertise theater, or restaurant entertainment is permitted. The maximum permitted size for an attraction board shall be fifty (50) square feet if placed on a building wall facing a public street or twenty-five (25) square feet on each side if such board is incorporated into a monument sign otherwise permitted in this Chapter. The advertising on the attraction board shall be limited to coming and current entertainment only.

11.    Gasoline service stations. In addition to the basic sign entitlement, gasoline service stations are allowed the following:

    a.    One (1) gasoline or fuel price sign per street frontage, placed either on the ground or on a pole, not to exceed twenty (20) square feet in area and six (6) feet in height, advertising the actual price per gallon or liter including all taxes at which regular, premium, and unleaded gasoline, are sold.

Any special conditions required for sale at such price including but not limited to "cash," "credit," "full-service," "mini-service," or "self-service," shall also be indicated.

    b.    One (1) wall sign advertising the company name and/or logo; the operator; and accessory uses, including but not limited to, "mini-mart," "car wash," not to exceed fifteen (15) square feet in area; or a monument sign advertising the information listed above, which does not exceed forty-eight (48) square feet in area, and complies with the provisions governing monument signs.

    c.    The restrictions imposed by this Chapter shall not be applicable to displays located on or above the actual fuel pumps, nor shall they apply to stand-up or other type displays of service related products such as motor oil, windshield wipers, credit card applications and similar items.

    d.    One (1) informational sign located on a building wall not to exceed ten (10) square feet in area.

12.    Fast service restaurants. In addition to the basic sign entitlement, fast service restaurants with drive-up or walk through facilities are permitted two (2) menu or reader boards with a maximum area of twenty-five (25) square feet each. For the purposes of determining this maximum area, any pictures or photographs of food products on the perimeter of the board shall not be included within the computation of the maximum area for such board.

13.    Automated or manual service facilities. Signs for drive-up or walk-up service windows or machines, whether freestanding or incorporated into a building, require special consideration which, because of their unlimited variety and character, a uniform sign entitlement cannot be established. Therefore, the sign allowance for such facilities shall be determined when the sign permit application is being reviewed on the basis of their function and use and such signs shall not be allowed as a method for increasing the basic sign entitlement for the principal use or

to function as off-site advertising of the principal use. Examples of such facilities are drive-up or walk-up windows for banks, restaurants, liquor and grocery stores, and film processors.

14.     Sale, lease and rental signs. Commercial and industrial properties may have sale, lease or rental signs on the following basis:

    a.     Under two and one-half (2 1/2) acres, one (1) sign;

    b.     Over two and one-half (2 1/2) acres, but less than five (5) acres, two (2) signs;

    c.     Over five (5) acres, one (1) sign per street frontage. Such permitted signs shall not exceed fifteen (15) square feet in area or six (6) feet in height and shall be designed and located in a manner satisfactory to the Manager. Such signs shall be removed within seven (7) days after the property is sold or rented or the offer for sale or rent is terminated. The property shall be deemed to be sold upon the close of escrow.

B.     Special Purpose Signs.

1.     Trade construction signs. One (1) non-illuminated sign per street frontage advertising the various construction trades is permitted on construction sites during the period that valid building permit approval exists. Such signs shall not exceed three (3) square feet per twenty thousand (20,000) square feet of land area with a maximum of thirty-two (32) square feet in sign area and shall be removed before a notice of completion is issued for the building being constructed. No trade construction sign shall exceed six (6) feet in height.

2.     "No trespassing" signs. "No trespassing" or "no dumping" signs per one hundred (100) feet of street frontage not exceeding three (3) square feet in area or six (6) feet in height are permitted for each parcel of land. Such signs shall be designed and located on such parcel in a manner approved by the Manager.

3.     Any sign which purport to restrict public access to State tidelands or public vertical and lateral easement areas, trails or parklands or to identify the boundary between State tidelands and private property shall not be permitted.

4.     Land subdivision signs. Signs advertising land subdivisions shall be limited to one (1) double-faced sign of thirty-two (32) square feet per side, placed at a right angle to the street or two (2) thirty-two-square-foot signs facing the street. The maximum height shall be ten (10) feet. Such signs shall be at least two hundred (200) feet apart and shall be located within the subdivision. Such signs shall be removed within twelve (12) months or when all lots within the subdivision are initially sold, whichever is sooner. Such signs shall not be illuminated.

5.     Lease potential signs. One (1) sign advertising lease potential for future development, not to exceed thirty-two (32) square feet in area and located a minimum of five (5) feet from any property line, is permitted for a single-parcel multiple-unit development. However, such sign shall not be erected until the architectural review approval is received for the proposed project, and all such signs shall be removed before a notice of completion for the development or upon expiration of the architectural review approval. Such signs shall face a public right-of-way and shall not be illuminated.

6.     Community and neighborhood identification signs. For identifiable communities or neighborhoods, a forty-eight (48) square foot sign may be permitted for each public street entrance. Such sign may be placed on

property line walls for a maximum of one (1) sign on each side of the entrance, or, as an alternative thereto such sign may consist of one (1) monument sign with a maximum height of six (6) feet.

7.      Signs on awnings. Painted, non-illuminated signs may be permitted on the borders of marquees, canopies, awnings, arcades, or similar structures or attachments, if located and erected in a manner satisfactory to the Manager. Such signs shall be included in the basic sign area entitlement. Externally lighted signs shall be permitted on the upper or lower surface of fixed marquees and similar structures, the front face of which faces the public right-of-way; provided that the outer dimensions of such signs shall not exceed sixteen (16) inches in height; and provided further that each letter or image on such a sign does not exceed twelve (12) inches in height. The location and design of such signs shall be approved by the Manager. Such signs shall be included in the total basic sign area entitlement.

8.      Grand opening signs. During an authorized grand opening event, temporary signs, not exceeding twenty (20) square feet in area may be approved by the Manager. Such signs may consist of one (1) banner on the exterior wall of the building within which the subject business is located. Such signs shall not be displayed more than thirty (30) days from the issuance of the sign permit.

In addition, during the first four (4) days of a grand opening event, captive balloons, without regard to number, may be permitted provided that such balloons do not extend beyond the lowest point of the roof line of the business, obstruct other business in the vicinity or interfere with pedestrian or vehicle traffic.

These restrictions shall not in anyway prohibit any person from handing out or giving away balloons as part of the normal activities of a business as long as such balloons are not in a captive state attached to a structure.

9.      Directional signs. Directional signs shall be limited in number to the greater of five (5) signs or four (4) signs per frontage for any business premises that has more than one (1) frontage. The maximum area for such signs shall be three (3) square feet, and such signs shall not exceed three (3) feet in height. A directional sign may display a logo of a business located on the subject property as well as an arrow or other directional symbol and/or words, including but not limited to "parking," "enter," "exit," "do not enter," "drive-thru," "welcome" and other similar messages. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

## 3.15.7  Administration

A.      Duty to Enforce. The Manager shall have the duty to enforce the provisions of this Chapter.

B.      Ambiguity. Whenever any ambiguity arises as to the interpretation of the provisions of this Chapter, the applicant for a sign permit may request that the Planning Commission make a determination as to the meaning and application of the ambiguous provision.

C.      Minor Modifications. The Planning Commission may approve minor modifications to the regulations relating to the size, height, number and location of new or existing signs after a public hearing in those cases where an applicant is faced with exceptional circumstances related to the type or location of its business, or is trying to achieve a special design. The applicant shall have the burden of proving that:

1.      The sign is or will be integrated into the architecture of the building;

2.    The sign is or will not be detrimental to surrounding uses or properties or the community in general; and

3.    The approval of such modification is consistent with the purposes of the Malibu Local Coastal Program and this Chapter.

Notwithstanding the foregoing, the size or height entitlement of a sign shall not be increased by more than thirty (30) percent.

D.    Discontinuance of a Business. Within thirty (30) days after the discontinuance of a business in any commercial zone or before a new business occupies the premises, whichever comes first, all nonconforming signs and support structures shall be removed and the working or advertising relating to the discontinued business shall be removed from all conforming signs. This section shall not be applicable to the assignment, lease or sublease of an existing business which continues to conduct the same business on the same premises.

E.    Nonconforming Sign Maintenance. Except for normal repair or maintenance not exceeding fifty (50) percent of the replacement cost of the sign, as determined by the building official, no nonconforming sign shall be modified or moved unless it complies fully with the provisions of this Chapter.

F.    Removal of Illegal Signs on Public Property. The Manager shall remove or cause to be removed any temporary sign unlawfully placed or located on public property. The Manager shall notify in writing the owner of such sign, if such owner is known, that its sign is being held at city hall and that it will be destroyed if not claimed by the owner within ten (10) days after the date of such notice. In the event that the owner does not claim such sign within said ten-day period, the Manager may destroy or otherwise dispose of such sign. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

View the mobile version.

Malibu Local Coastal Program

## CHAPTER 13—COASTAL DEVELOPMENT PERMITS

### 13.1. PURPOSE AND INTENT

The purpose and intent of this chapter is to establish the process for the review of all development within the coastal zone of the city of Malibu to ensure that it will be consistent with the provisions of the city of Malibu Local Coastal Program, the California Coastal Act and the California Code of Regulations Title 14 Division 5.5.

### 13.2. APPLICABILITY

All properties within the city of Malibu are located within the coastal zone as defined in the California Coastal Act and are subject to the provisions of this chapter. Where the standards or procedures described in this chapter for issuing coastal development permits conflict with any other permit procedures in the city's general plan or other city-adopted plan, resolution or ordinance not included in the LCP, and it is not possible for the development to comply with both the LCP and other plans, resolutions or ordinances, the standards or procedures described herein shall take precedence.

### 13.3. PERMIT REQUIRED

A.      Except as otherwise provided in this chapter, any person wishing to perform or undertake any development in the coastal zone, other than a facility subject to Public Resources Code Section 25500, shall obtain a coastal development permit in accordance with the provisions of this chapter. Development undertaken pursuant to a coastal development permit shall conform to the plans, specification, terms and conditions of the permit. The requirements for obtaining a coastal development permit shall be in addition to requirements to obtain any other permits or approvals required by other city ordinances or codes or from any state, regional or local agency. Subsequent to the certification of the LCP, the city shall immediately assume coastal development permitting authority and no application for a coastal development permit shall be deemed approved if the city fails to take timely action to approve or deny the application for a coastal development permit.

B.      A person undertaking development included in a public works plan or long range development plan approved by the Coastal Commission is not required to obtain a coastal development permit from the city. Other city permits may be required.

C.      The review of a coastal development permit application may be combined with and/or processed concurrently with the review of any other discretionary permit application required by other city ordinances. When an application for a planned development is proposed, the city shall not grant any discretionary approval of a planned development that conflicts with any policy or standard of the LCP, including the land use designations. The city may request certification of an LCP amendment to accommodate a proposed planned development in accordance with the procedures in Chapter 19 of the Malibu LIP (LCP amendment procedures). Neither the preliminary development plan nor the final development plan shall be effective until or unless a coastal development permit is approved that authorizes the development included in the plan.

D.      All development proposed or undertaken on tidelands, submerged lands or on public trust lands, whether filled or unfilled, or within any state university or college within the coastal zone shall require a permit issued by the California Coastal Commission in accordance with procedures specified by the Coastal Commission, in addition to other permits or approvals required by the city.

E.      Where a proposed project straddles the boundaries of the city of Malibu and another local jurisdiction or where a proposed project straddles the boundaries of the city's Coastal Development Permit jurisdiction area and the Coastal Commission's retained jurisdiction area, the applicant shall obtain separate Coastal Development Permits from each jurisdiction.

F.      Development that occurred after the effective date of the Coastal Act or its predecessor, the Coastal Zone Conservation Act, if applicable, that was not authorized in a coastal development permit or otherwise authorized under the Coastal Act, is not lawfully established or lawfully authorized development. No improvements, repair, modification or additions to such existing development may be approved, unless the city also approves a coastal development permit that authorizes the existing development. The coastal development permit shall only be approved if the existing and proposed development, with any applicable conditions of approval, is consistent with the policies and standards of the LCP.

## 13.4. EXEMPTIONS FROM AND DE MINIMIS WAIVERS OF COASTAL DEVELOPMENT PERMIT

The projects described in Sections 13.4.1 through 13.4.9 are exempt from the requirement to obtain a Coastal Development Permit and subject to the requirements of Section 13.4.10. Section 13.4.11 describes general requirements for de minimis waivers and projects eligible for de minimis waivers.

### 13.4.1   Exemption for Improvements to Existing Single-Family Residences

A.      Improvements to existing single-family residences except as noted below in (B). For purposes of this section, the terms "Improvements to existing single-family residences" includes all fixtures and structures directly attached to the residence and those structures normally associated with a single family residence, such as garages, swimming pools, fences, storage sheds and landscaping but specifically not including guest houses or accessory self-contained residential units.

B.      The exemption in (A) above shall not apply to the following classes of development which require a coastal development permit because they involve a risk of adverse environmental impact:

1.      Improvements to a single-family structure if the structure or improvement is located: on a beach, in a wetland, seaward of the mean high tide line, in an environmentally sensitive habitat area, or within fifty (50) feet of the edge of a coastal bluff.

2.      Any significant alteration of land forms including removal or placement of vegetation, on a beach, wetland, or sand dune, or within fifty (50) feet of the edge of a coastal bluff, or in environmentally sensitive habitat areas.

3.      The expansion or construction of water wells or septic systems.

4.      On property not included in subsection (B)(1) above that is located between the sea and the first public road paralleling the sea or within three hundred (300) feet of the inland extent of any beach or of the mean high tide of the sea where there is no beach, whichever is the greater distance, or in significant scenic resources areas as designated by the city or Coastal Commission, improvement that would result in an increase of ten (10) percent or more of internal floor area of an existing structure or an additional improvement of ten (10) percent or less where an improvement to the structure had previously been undertaken pursuant to this section or Public Resources Code section 30610(a), increase in height by more than ten (10) percent of an existing

structure and/or any significant non-attached structure such as garages, fences, shoreline protective works or docks.

      5.      In areas which the city or Coastal Commission has previously declared by resolution after public hearing to have a critically short water supply that must be maintained for the protection of coastal resources or public recreational use, the construction of any specified major water using development not essential to residential use including but not limited to swimming pools, or the construction or extension of any landscaping irrigation system.

      6.      Any improvement to a single-family residence where the development permit issued for the original structure by the Coastal Commission, regional Coastal Commission, or city indicated that any future improvements would require a development permit.

## 13.4.2   Exemption for Repair and Maintenance Activities

    A.      Repair or maintenance activities that do not result in an addition to, or enlargement or expansion of, the object of those repair or maintenance activities.

    B.      The exemption in Section 13.4.2 (A) of the Malibu LIP shall not apply to the following extraordinary methods of repair and maintenance which require a coastal development permit because they involve a risk of adverse environmental impact:

      1.      Any method of repair or maintenance of a seawall, revetment, bluff retaining wall, breakwater, groin, culvert, outfall, or similar shoreline work that involves:

          a.      Repair or maintenance involving substantial alteration of the foundation of the protective work including pilings and other surface or subsurface structures;

          b.      The placement, whether temporary or permanent, of rip-rap, artificial berms of sand or other beach materials, or any other forms of solid materials, on a beach or in coastal waters, streams, wetlands, estuaries and lakes or on a shoreline protective works;

          c.      The replacement of twenty (20) percent or more of the materials of an existing structure with materials of a different kind; or

          d.      The presence, whether temporary or permanent, of mechanized construction equipment or construction materials on any sand area, bluff, or environmentally sensitive habitat area, or within twenty (20) feet of coastal waters or streams.

      2.      Any method of routine maintenance dredging that involves:

          a.      The dredging of one hundred thousand (100,000) cubic yards or more within a twelve (12) month period;

          b.      The placement of dredged spoils of any quantity within an environmentally sensitive habitat area, on any sand area, within fifty (50) feet of the edge of a coastal bluff or environmentally sensitive habitat

area, or within twenty (20) feet of coastal waters or streams; or

     c.    The removal, sale, or disposal of dredged spoils of any quantity that would be suitable for beach nourishment in an area the city or the Coastal Commission has declared by resolution to have a critically short sand supply that must be maintained for protection of structures, coastal access or public recreational use.

3.    Any repair or maintenance to facilities or structures or work located in an environmentally sensitive habitat area, any sand area, within fifty (50) feet of the edge of a coastal bluff or environmentally sensitive habitat area, or within twenty (20) feet of coastal waters or streams that include:

     a.    The placement or removal, whether temporary or permanent, of rip-rap, rocks, sand or other beach materials or any other forms of solid materials;

     b.    The presence, whether temporary or permanent, of mechanized equipment or construction materials.

C.    All repair and maintenance activities governed by Section 13.4.2 (B) shall be subject to the LCP permit regulations, including but not limited to the regulations governing administrative and emergency permits. The provisions of Section 13.4.2 (B) shall not be applicable to those activities specifically described in the document entitled Repair, Maintenance and Utility Hookups, adopted by the Coastal Commission on September 5, 1978 unless a proposed activity will have a risk of substantial adverse impact on public access, environmentally sensitive habitat area, wetlands, or public views to the ocean.

D.    Unless destroyed by natural disaster, the replacement of fifty (50) percent or more of a single-family residence, (as measured by fifty (50) percent of the exterior walls), seawall, revetment, bluff retaining wall, breakwater, groin or any other structure is not repair and maintenance but instead constitutes a replacement structure requiring a coastal development permit.

### 13.4.3   Exemption for Other Improvements

A.    Improvements to any structure other than a single-family residence or a public works facility except as noted below in Section 13.4.3 (B) of the Malibu LIP. For purposes of this section, where there is an existing structure, other than a single-family residence or public works facility, the following shall be considered a part of that structure:

1.    All fixtures and other structures directly attached to the structure.

2.    Landscaping on the lot.

B.    The exemption in 13.4.3 (A) above shall not apply to the following classes of development which require a coastal development permit because they involve a risk of adverse environmental effect, adversely affect public access, or involve a change in use contrary to the policies of the LCP.

1.    Improvement to any structure if the structure or the improvement is located: on a beach; in a wetland, stream, or lake; seaward of the mean high tide line; or within fifty (50) feet of the edge of a coastal bluff;

2.      Any significant alteration of land forms including removal or placement of vegetation, on a beach or sand dune; in a wetland or stream; within one hundred (100) feet of the edge of a coastal bluff, or in an environmentally sensitive habitat area;

3.      The expansion or construction of water wells or septic systems;

4.      On property not included in subsection 13.4.3 (B)(1) of the Malibu LIP above that is located between the sea and the first public road paralleling the sea or within three hundred (300) feet of the inland extent of any beach or of the mean high tide of the sea where there is no beach, whichever is the greater distance, or in significant scenic resource areas as designated by the LUP, an improvement that would result in an increase of ten (10) percent or more of internal floor area of the existing structure, or constitute an additional improvement of ten (10) percent or less where an improvement to the structure has previously been undertaken pursuant to subsection A above or Public Resources Code Section 30610(b), and/or increase in height by more than ten (10) percent of an existing structure;

5.      In areas which the city or the Coastal Commission has previously declared by resolution after public hearing to have a critically short water supply that must be maintained for protection of coastal recreation or public recreational use, the construction of any specified major water using development including, but not limited to, swimming pools or the construction or extension of any landscaping irrigation system;

6.      Any improvement to a structure where the coastal development permit issued for the original structure by the city or the Coastal Commission indicated that any future improvements would require a development permit;

7.      Any improvement to a structure which changes the intensity of use of the structure;

8.      Any improvement made pursuant to a conversion of an existing structure from a multiple unit rental use or visitor-serving commercial use to a use involving a fee ownership or long-term leasehold including but not limited to a condominium conversion, stock cooperative conversion or motel/hotel timesharing conversion.

## 13.4.4   Exemption for Categorically Excluded Development

Projects pursuant to a Categorical Exclusion Order as certified by the California Coastal Commission pursuant to Public Resources Code 30610(e).

## 13.4.5   Exemption for Utility Connections

The installation, testing, and placement in service or the replacement of any necessary utility connection between an existing service facility and any development which has been granted a valid coastal development permit; provided, however, that the city may, where necessary, require reasonable conditions to mitigate any adverse impacts on coastal resources, including scenic resources.

## 13.4.6   Exemption for Structures Destroyed by Natural Disaster

A.      The replacement of any structure, other than a public works facility, destroyed by a disaster provided that the replacement structure meets all the of the following criteria:

1.      It is for the same use as the destroyed structure;

2.      It does not exceed either the floor area, height, or bulk of the destroyed structure by more than ten (10) percent, and

3.      It is sited in the same location on the affected property as the destroyed structure.

As used in this section, "structure" includes landscaping and any erosion control structure or device which is similar to that which existed prior to the occurrence of the disaster.

B.      An onsite wastewater treatment system (OWTS) that was damaged or destroyed by a disaster may be replaced provided that the replacement OWTS does not exceed the capacity of the damaged or destroyed OWTS by more than ten (10) percent. For purposes of this section, if the existing tank is less than one thousand five hundred (1500) gallons the proposed new tank shall be allowed to increase in capacity to one thousand five hundred (1500) gallons only to meet the minimum code requirement of the city under this exemption.

## 13.4.7  Exemption for Time Share Conversions

Any activity anywhere in the city's coastal zone that involves the conversion of any existing multiple-unit residential structure to a time-share project, estate, or use, as defined in Section 11003.5 of the Business and Professions Code. If any improvement to an existing structure is otherwise exempt from the permit requirements of this ordinance, no coastal development permit shall be required for that improvement on the basis that it is to be made in connection with any conversion exempt pursuant to this ordinance. The division of a multiple-unit residential structure into condominiums, as defined in Section 783 of the Civil Code, shall not be considered a time-share project, estate, or use for purposes of this subdivision.

## 13.4.8  Exemption for Repair, Maintenance and Utility Hook-Up Exclusions

Repair and maintenance activities, specifically described in the document adopted by the Coastal Commission on September 5, 1978 titled "Repair, Maintenance and Utility Hook-Up Exclusions from Permit Requirements" unless the proposed activity will have a risk of substantial adverse impact on public access, environmentally sensitive habitat area, wetlands or public views to the ocean. The following activity has been determined by the certified LUP to have a risk of substantial adverse impacts and is therefore not exempt:

The removal of vegetation from, or other minor road improvements, to a lawfully established public or private road on private property which has not been maintained for a period of five years.

## 13.4.9  Exemption for Temporary Event

Temporary events as defined in this chapter and which meet all of the criteria in (A)—(D).

A.      The event will not occur between Memorial Day weekend and Labor Day or if proposed in this period will be of less than one day in duration including set-up and take-down; and

B.      The event will not occupy any portion of a publicly or privately owned sandy beach or park area; public pier, public beach parking areas or the location is remote with minimal demand for public use, and there is no potential for adverse effect of sensitive coastal resources; and

C.       A fee will not be charged for general public admission and/or seating where no fee is currently charged for use of the same area (not including booth or entry fees); or, if a fee is charged, it is for preferred seating only and more than seventy-five (75) percent of the provided seating capacity is available free of charge for general public use.

D.       The proposed event has been reviewed in advance by the planning manager and the manager determined that it meets the following criteria:

1.       The event will result in no adverse impact on opportunities for public use of or access to the area due to the proposed location and or timing of the event either individually or together with other temporary events scheduled before or after the particular event;

2.       There will be no direct or indirect impacts from the event and its associated activities or access requirements on environmentally sensitive habitat areas, rare or endangered species, significant scenic resources, or other coastal resources as defined in the LIP;

3.       The event has not previously required a coastal development permit to address and monitor associated impacts to coastal resources.

For all other proposed temporary events, a coastal development permit must be obtained prior to the event.

E.       Signs Associated with Exempt Temporary Events. Any temporary signs associated with any temporary event shall be consistent with provisions of Section 3.15 of the Malibu LIP. (Ord. 303 § 3, 2007)

## 13.4.10 Record of Permit Exemptions

The planning manager shall maintain a record of all those developments within the coastal zone that have been authorized as being exempt from the requirement for a coastal development permit pursuant to this chapter. This record shall be available for review by members of the public and representatives of the California Coastal Commission. The record of exemption shall include the name of the applicant, the location of the project, and a brief description of the project.

## 13.4.11 General Requirements for De Minimis Waiver

A.       General Requirements for De Minimis Waiver.

The requirement for a coastal development permit may be waived through a De Minimis Coastal Development Permit Waiver issued by the planning director for the items listed below where the improvements are not otherwise exempt pursuant to Section 13.4, provided all the requirements of subsections B and C are met. The planning director's decision on whether to issue a de minimis waiver is not locally appealable.

1.       Improvements to an onsite wastewater treatment system (OWTS) serving a structure that was damaged or destroyed as a result of a natural disaster, where the improvements involve installing a new system or upgrading an existing system to an advanced system on the same lot.

2.       Minor improvements to existing driveways or access roads that are required by the fire department after a natural disaster, such as minor changes to the width or grade of driveways or access roads. Access

improvements that do not meet the findings for a waiver may be processed as an administrative coastal development permit (ACDP) under Section 13.13.1(A) or as a regular coastal development permit.

B.       Findings for and Reporting of De Minimis Waivers.

All decisions on de minimis waivers shall be accompanied by written findings:

1.       That the OWTS or driveway/road improvements have no potential for adverse effects, either individually or cumulatively, on coastal resources.

2.       That the OWTS or driveway/road improvements are consistent with the certified Malibu Local Coastal Program, including the resource protection policies, as applicable.

3.       If an OWTS is to be relocated on the lot, that the director, in consultation with the environmental health administrator, has determined the relocation is necessary to better protect coastal resources.

4.       If driveway/road improvements are proposed, that: (a) they are in the same general alignment as the existing road; (b) they are not located in environmentally sensitive habitat area (ESHA); (c) they do not remove or encroach within the protected zone of native trees; and (d) they do not adversely impact visual resources.

5.       That the development is not in a location where an action on the development would be appealable to the coastal commission (See Chapter 2 – Definitions).

C.       Reporting De Minimis Waiver.

1.       At the time the application is submitted for filing, the applicant must post, at a conspicuous place as close to the site as possible that is easily accessible by the public and approved by the city, notice, on a form approved by the city, that an application for a de minimis waiver has been submitted to the city. Such notice shall contain a general description of the nature of the proposed development.

2.       The planning director shall issue a notice of determination on the application which shall be reported to the planning commission. The notice of determination shall be provided to all known interested parties, including the executive director of the coastal commission, at least ten (10) days prior to the waiver determination being reported to the planning commission.

3.       If, after consideration of the waiver and any public objections to it, the planning commission requests that the waiver not be effective, then the applicant shall be advised that a Coastal development permit is required for the OWTS or road improvements. Otherwise, the waiver is effective immediately after the planning commission meeting where the matter is heard.

D.       Waiver Expiration.

A de minimis waiver shall expire and be of no further force and effect if the authorized OWTS or driveway or access road improvements are not commenced pursuant to a valid grading and/or building permit, as applicable,

within five years of the effective date of the waiver. If expired, a coastal development permit or another waiver shall be required. (Ord. 445 § 4, 2019; Ord. 303 § 3, 2007)

## 13.5. NONCONFORMING USE OR STRUCTURES

A.     This section (13.5) shall apply to the following: (1) any existing and lawfully established or lawfully authorized use of land or to any existing and lawfully established or lawfully authorized buildings and other structures that do not conform to the policies and development standards of the certified LCP, or any subsequent amendments thereto; and (2) development that is not exempt from the coastal development permit requirements pursuant to Section 13.4 of the Malibu LIP (Exemptions). Development that occurred after the effective date of the Coastal Act or its predecessor, the Coastal Zone Conservation Act, if applicable, that was not authorized in a coastal development permit or otherwise authorized under the Coastal Act, is not lawfully established or lawfully authorized development, is not subject to the provisions of Section 13.5, but is subject to the provisions of Section 13.3 (F) of the Malibu LIP.

B.     Nonconforming uses as defined by 13.5(A) of the Malibu LIP shall not be intensified, or expanded into additional locations or structures.

C.     Nonconforming structures as defined by 13.5(A) of the Malibu LIP may be repaired and maintained if it does not result in enlargement or expansion of the structure. However, demolition and/or reconstruction that results in replacement of more than fifty (50) percent of non-conforming structures, including all demolition and/or reconstruction that was undertaken after certification of the LCP, is not permitted unless such structures are brought into conformance with the policies and standards of the LCP.

D.     Additions and/or improvements to nonconforming structures may be authorized, provided that the additions and/or improvements themselves comply with the current policies and standards of the LCP, except as provided in Section 13.5 (F) of the Malibu LIP.

E.     For nonconforming structures located on a blufftop or on the beach that do not comply with the setbacks required for new development on a blufftop or beach, additions that increase the size of the structure by fifty (50) percent or more, including all additions that were undertaken after certification of the LCP, shall not be authorized unless such structures are brought into conformance with the policies and standards of the LCP.

F.     If a nonconforming use or structure as defined by 13.5(A) of the Malibu LIP is damaged or destroyed by natural disaster, replacement shall be subject to provisions of 13.4.6 of the Malibu LIP (Structures Destroyed by Natural Disaster).

G.     If any nonconforming use as defined by 13.5 (A) of the Malibu LIP is abandoned for a continuous period of not less than 6 months, any subsequent use of such land or the structure in which the use was located shall be in conformity with the regulations specified by the LCP for the district in which such land is located.

## 13.6. APPLICATION REQUIREMENTS AND FEES

### 13.6.1   Filing Procedures

A.     Application for a coastal development permit and amendments to coastal development permits shall be made to the Planning or Building Department on an application form provided by the Department, together with all

RJN - 57

required plans, maps, elevations, reports and any such supporting information deemed necessary by the Planning Department or any other ordinance contained in the certified LCP to adequately assess and evaluate the proposed project for consistency with the LCP. Application for a coastal development permit may be submitted concurrently with other city permits required by the City Municipal Code. The application may include a fee set by the City Council.

B.      Following submittal of an application, the Planning Department shall review the application for completeness. Within 30 calendar days from submittal, the Planning Department shall notify the applicant in writing of which parts of the application are incomplete and describe the specific materials needed to complete the application. Not later than 30 days after receipt of the requested materials, the Planning Department shall determine whether the submittal of the requested materials is complete and transmit that determination to the applicant. If no determination of completeness is provided to the applicant within 30 days of submittal, the application will be deemed complete. Any application for a coastal development permit shall not be determined to be complete and shall not be filed until and unless the applicable requirements of sections 13.6.2, 13.6.3 and 13.6.4 of the Malibu LIP have been met. Until such application is determined to be complete by the Planning Department, no action shall be taken on it by the Planning Department.

C.      To the maximum extent feasible, functionally related developments to be performed by the same applicant shall be the subject of a single permit application. The Planning Manager shall not accept for filing a second application for development which is the subject of a permit application already pending before the City. This section shall not limit the right of an applicant to amend a pending application.

D.      The Planning Manager shall not accept for filing an application for development on a lot or parcel or portion thereof which is the subject of a pending proposal for an adjustment to the boundary of the coastal zone pursuant to Public Resources Code section 30103(b) of the Coastal Act. (Ord. 303 § 3, 2007)

## 13.6.2   Proof of Ownership or Owner's Consent

A.      In addition to other information required to be submitted with an application, applicants must prove that they own the property which is the subject of the application or provide the City with written consent from the owner for the proposed development for the City to file the application.

B.      Applicants for development along the shoreline property or fronting a beach shall submit written evidence of a review and determination from the California State Lands Commission relative to the project's location to or impact upon the boundary between public tidelands and private property.

C.      Where the applicant for a Coastal Development Permit is not the owner of a fee interest in the property on which a proposed development is to be located, but can demonstrate a legal right, interest, or other entitlement to use the property for the proposed development, the City shall not require the holder or owner of any superior interest in the property to join as a co-applicant. All holders or owners of any other interest of record in the affected property shall be notified in writing of the permit application and invited to join as co-applicant.

D.      Prior to the issuance of a Coastal Development Permit, the applicant shall demonstrate the authority to comply with all conditions of approval.

## 13.6.3   Application Fees

RJN - 58

The City Council may, by resolution, establish a schedule of fees for coastal development permits, approvals, and other matters pertaining to this Chapter. The schedule of fees may be changed or modified only by resolution of the City Council. Until all applicable fees have been paid in full, no application shall be deemed complete and no action shall be taken on any application, appeal or other matter pertaining to this Chapter for which a fee is required.

### 13.6.4   Application Form and Information Requirements

The coastal development permit application form shall require submittal of at least the following items:

A.      A description and documentation of the applicant's legal interest in all the property upon which work would be performed, if the application were approved, e.g., ownership, leasehold, enforceable option, authority to acquire the specific property by eminent domain.

B.      For development on a vacant lot(s), a complete title history, including evidence that the lot proposed for development is a legally created lot, and information on the date and method by which the lot was created. Where the City determines that the lot(s) was created after the effective date of the Coastal Act, or was created prior to the effective date of the Coastal Act but without complying with applicable state or local requirements, either evidence of a valid coastal development permit authorizing the subdivision or other form of lot creation must be submitted prior to filing of any application for proposed development on the lot, or the subdivision or other form of lot creation must be included as part of the application request in order to be deemed filed. In addition, a listing of any prior coastal development permits issued for the property shall be provided.

C.      An adequate description including maps, plans, photographs, etc., of the proposed development, project site and vicinity sufficient to determine whether the project complies with all relevant policies of the Malibu LCP, including sufficient information concerning land and water areas in the vicinity of the site of the proposed project, (whether or not owned or controlled by the applicant) so that the City will be adequately informed as to present uses and plans, both public and private.

D.      A site plan, to scale, showing:

1.      Existing and proposed property lines on the site, including all dedications, easements or recorded offers to dedicate easements, deed restrictions over or adjacent to the site and documentation for such recorded instruments.

2.      Existing and proposed topography, at a contour interval appropriate to the size of the site to be developed;

3.      All existing and proposed structures, roads, utilities lines, signs, fences and other improvements; and

4.      Major natural and man-made landscape features, including location, type, size and quantification of acreage of any trees or other natural vegetation to be planted or to be removed or made subject to thinning, irrigation or other modification by the proposed project including building pad and road/driveway areas.

5.      Location and amount of any fuel modification or brush clearance that would be required on the site and on adjacent properties to comply with fire safety requirements.

E.    Except on parcels within existing, developed neighborhoods where any new structures will be located over 200 feet from ESHA as mapped on the ESHA overlay map, an inventory of the plant and animal species present on the project site, or those known or expected to be present on the project site at other times of the year, prepared by a qualified biologist, or resource expert. The inventory shall include an identification of any species present that have been designated as rare, threatened, or endangered species under State or Federal law. Where the initial site inventory indicates the presence or potential for sensitive species or habitat on the project site, the submittal of a detailed biological assessment of the site is required, consistent with the provisions of Chapter 4 of the Malibu LIP.

F.    Building elevations, showing:

1.    All exterior walls

2.    Type of roof and other exterior materials and

3.    Location and design of roof equipment, trash enclosures, fences, exterior lights, signs and other exterior structures and equipment.

G.    Drainage and Erosion Control Plans as required by Chapter 17 of the Malibu LIP (Water Quality).

H.    For development relying on an Onsite Wastewater Treatment System, a Septic Plot Plan, prepared by an Environmental Health Specialist that shall include a percolation testing report and septic system design of adequate size, capacity and design to serve the proposed development for the life of the project.

I.    For applications for land divisions:

1.    Except for proposed parcels that will be connected to the Civic Center Wastewater Treatment Facility, a report prepared by a registered groundwater hydrologist and Environmental Health Specialist that addresses the ability of each proposed building site to accommodate a sewage disposal system, including an analysis of depth to groundwater that addresses seasonal and cyclical variations as well as the adequacy of percolation rates in post- grading conditions (cut or compacted fill); properties that will be connected to the Civic Center Wastewater Treatment Facility shall obtain approval from the City Public Works Department for the connection.

J.    For applications for water wells, a groundwater hydrological study that analyzes the individual and cumulative impacts the well may have on groundwater supplies and the potential individual and cumulative impacts the well may have on adjacent or nearby streams, springs, or seeps and their associated riparian habitat.

K.    For applications for development located in areas identified by the City or State as archaeologically sensitive, a site survey performed by a qualified archaeologist consistent with the requirements of Chapter 11 of the Malibu LIP, including alternatives that would avoid or minimize impacts to resources and recommended measures to mitigate impacts to resources.

L.    For applications for development located in areas visible from public viewing areas, public trails, beaches or scenic roads, a visual analysis as required by Chapter 6 of the Malibu LIP (Scenic and Visual Resource Protection).

M.    The description of the development shall also include any feasible alternatives or any feasible mitigation measures available which would substantially lessen any significant adverse impact which the development may have on the environment. For purposes of this section the term "significant adverse impact on the environment"

RJN - 60

shall be defined as: "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project, including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (CEQA Guidelines, 14 Cal. Code of Reg. Section 15382).

N.      A dated signature by or on behalf of each of the applicants, attesting to the truth, completeness and accuracy of the contents of the application and, if the signer of the application is not the applicant, written evidence that the signer is authorized to act as the applicant's representative and to bind the applicant in all matters concerning the application.

O.      In addition to full size drawings, maps, photographs, and other exhibits drawn to scale, either one (1) copy of each drawing, map, photograph, or other exhibit approximately 8 1/2 in. by 11 in., or if the applicant desires to distribute exhibits of a larger size, enough copies reasonably required for distribution to those persons on the City's mailing lists and for inspection by the public in the City offices. A reasonable number of additional copies may, at the discretion of the Planning Manager, be required.

P.      A list of names and addresses of, and stamped envelopes for, adjacent landowners and residents, and other interested persons as provided in Section 13.12 of the Malibu LIP (Public Notice). The applicant shall provide the City with all of the following:

  1.      The addresses of all residences, including each residence within an apartment or condominium complex, located within one hundred (100) feet (not including roads) of the perimeter of the parcel of real property of record on which the development is proposed;

  2.      The addresses of all owners of parcels of real property of record located within one hundred (100) feet (not including roads) of the perimeter of the parcel of real property of record on which the development is proposed, based upon the most recent equalized assessment roll;

  3.      The names and addresses of all persons known to the applicant to be interested in the application;

  4.      Stamped envelopes for all addresses on the list prepared pursuant to subsection (a) above. Separate stamped envelopes shall be addressed to "owner," "occupant," or the name of the interested person, as applicable. The applicant shall also place a legend on the front of each envelope including words to the effect of "Important. Public Hearing Notice." The legend shall be legible and of sufficient size to be reasonably noted by the recipient of the envelope.

Q.      The Water Quality Checklist as required by Chapter 17 of the Malibu LIP (Water Quality).

R.      Any additional information, including identified preliminary approvals by local, state and federal agencies, for specific categories of development or for development proposed for specific geographic areas where otherwise required by specific LCP policies or regulations. This shall include but not be limited to site specific filing requirements specified in: the Public Access Chapter (Ch. 12), the Environmentally Sensitive Habitat Area Overlay Chapter (Ch. 4), the Scenic and Visual Resource Protection Chapter (Ch. 6), the Subdivision Chapter (Ch. 15), the Hazards/Geology Chapter (Ch. 10); the Shoreline and Bluff Development Chapter (Ch. 10), the Archaeological/Cultural Resources Chapter (Ch. 11), or the Water Quality Protection Chapter (Ch. 17) of the Malibu LIP. Where more specific filing requirements are provided for in other Chapters of the Malibu LIP which conflict with the provisions of this Chapter, the more specific provisions shall govern.

S.    The application form shall also provide notice to applicants that failure to provide truthful and accurate information necessary to review the permit application or to provide public notice as required by these requirements may result in delay in processing the application or may constitute grounds for revocation of the permit.

T.    Any additional information determined by the Planning Manager to be necessary for reviewing and processing of the application.

U.    Notwithstanding any other requirements of the LCP, an applicant shall not be required to undertake onsite surveys of properties that are not under the control of the landowner or applicant of the application being filed, if the applicant cannot, after a good faith effort, secure permission from such other landowner for access to the property needed to conduct the study. Should such permission for access not be granted, the application shall include documentation of the effort(s) employed to gain access and the results of such study of the offsite property as can reasonably be conducted without entering the site. (Ord. 393 § 4, 2015; Ord. 303 § 3, 2007)

## 13.7. ACTION ON COASTAL DEVELOPMENT PERMIT

A.    Permits issued under Section 13.13 of the Malibu LIP (Administrative Permits), and any subsequent changes to the administrative permit that are consistent with Section 13.3 of the Malibu LIP, and permits issued under Section 13.14 of the Malibu LIP (Emergency Permits) may be decided upon by the Planning Manager.

B.    All other coastal development permits shall be decided upon by the Planning Commission subject to appeal provisions in Section 13.20 of the Malibu LIP (Appeals). Minor changes to the permit may be subsequently decided upon by the Manager consistent with Administrative Permit procedures; significant changes from the original approval of the permit must be approved through a permit amendment approved by the Planning Commission.

C.    Except as provided in Section 13.4 of the Malibu LIP (Emergency Permits), the Environmental Review Board (ERB) shall serve as advisors to the Planning Manager, Planning Commission and City Council for coastal development permits within or adjacent to ESHA as provided in the ESHA Overlay zone or identified as being ESHA pursuant to provisions of the ESHA Overlay Chapter (Ch. 4) of the Malibu LIP. The ERB shall provide recommendations on the conformance or lack of conformance of the proposed project with the policies of the certified Malibu LUP and may suggest mitigation measures designed to avoid or minimize impacts on environmentally sensitive habitat area resources. (Ord. 303 § 3, 2007)

## 13.8. CONDITIONS

Approval of a coastal development permit shall be subject to conditions as necessary to ensure conformance with, and implementation of, the certified Local Coastal Program. Modification and resubmittal of project plans, drawings and specifications, preparation of additional plans, or recordation of documents may be required to ensure conformance with the Malibu Local Coastal Program. When modifications and resubmittal of plans, additional plans, or recorded documents are required, issuance of the permit shall be deferred for a sufficient period of time to allow the Planning Manager to determine if the modified project, the additional plans, or the recorded documents comply with the conditions of approval of the permit. (Ord. 303 § 3, 2007)

## 13.9. FINDINGS

All decisions on coastal development permits shall be accompanied by written findings:

A.      That the project as described in the application and accompanying materials, as modified by any conditions of approval, conforms with certified City of Malibu Local Coastal Program; and

B.      If the project is located between the first public road and the sea, that the project is in conformity with the public access and recreation policies of Chapter 3 of the Coastal Act of 1976 (commencing with Sections 30200 of the Public Resources Code).

C.      The project is the least environmentally damaging alternative.

D.      If the project is located in or adjacent to an environmentally sensitive habitat area pursuant to Chapter 4 of the Malibu LIP (ESHA Overlay), that the project conforms with the recommendations of the Environmental Review Board, or if it does not conform with the recommendations, findings explaining why it is not feasible to take the recommended action.

## 13.10. DETERMINING NOTICE AND HEARING PROCEDURES

At the time a complete application for a Coastal Development Permit is made, the Planning Manager shall determine and inform the applicant of the applicable review procedures as established herein. The determinations required by this section shall be made based on the provisions of this chapter and with reference to the certified Local Coastal Program, including any maps, land use designations and zoning ordinances which are adopted as part of the Local Coastal Program.

A.      Types of Applications. The Planning Manager shall first determine whether the proposed development is:

1.      Subject to the requirement for a Coastal Development Permit or permit amendment from the Coastal Commission;

2.      Appealable to the Coastal Commission consistent with Chapter 2 of the Malibu LIP (Definitions);

3.      Exempt from the Coastal Development Permit requirements as defined in Section 13.4 of the Malibu LIP;

4.      Subject to the requirement of securing a Coastal Development Permit to be issued by the City. (Ord. 303 § 3, 2007)

### 13.10.1 Appeals of Determination of Permit Type and Jurisdiction

Where an applicant, interested person, or the city has a question as to the appropriate designation for the development, the following procedures shall establish whether a development is non-appealable or appealable:

A.      The Planning Manager or his or her designee shall make its determination as to what type of development is being proposed (i.e. appealable, non-appealable) and shall inform the applicant of the notice and hearing requirements for that particular development.

B.      If the determination of the Planning Manager is challenged by the applicant or an interested person, or if the City wishes to have a Coastal Commission determination as to the appropriate designation, the Planning Manager

shall notify the District Director of the South Central Coast District Office of the Coastal Commission by telephone or in writing of the dispute/question and shall request the Executive Director's determination as to whether the development is categorically excluded, non-appealable or appealable.

C.    The Executive Director of the Coastal Commission shall, within two (2) working days of the local government request (or upon completion of a site inspection where such inspection is warranted), transmit his or her determination as to whether the development is categorically excluded, non-appealable or appealable.

D.    Where, after the Executive Director's investigation, the Executive Director's determination is not in accordance with the City Planning Manager's determination, the Coastal Commission shall hold a hearing for purposes of determining the appropriate designation for the area. The Commission shall schedule the hearing on the determination for the next Commission meeting (in the appropriate geographic region of the state) following the Executive Director's determination. (Ord. 303 § 3, 2007)


**13.10.2 Jurisdiction**

A.    The City's jurisdiction over Coastal Development Permits does not include tidelands, submerged lands, and public trust lands as described in Section 30519(b) of the Public Resources Code and described as areas of Coastal Commission Permit Jurisdiction illustrated on the Local Coastal Program Post-Certification Permit and Jurisdiction Map as amended.

B.    The Commission retains authority over coastal development permits issued by the Commission including condition compliance. Where either new development, or a modification to existing development, is proposed on a site where development was authorized in a Commission-issued coastal development permit either prior to certification of the LCP or through a de novo action on an appeal of a city-approved coastal development permit and the permit has not expired or been forfeited, the applicant shall apply to the City for the coastal development permit except for:

    1.    Requests for extension, reconsideration and revocation of the Commission-issued permits;

    2.    Development that would lessen or negate the purpose of any specific permit condition, any mitigation required by recorded documents, any recorded offer to dedicate or grant of easement or any restriction/limitation or other mitigation incorporated through the project description by the permittee, of a Commission-issued coastal permit.

In any of these circumstances, the applicant must seek to file an application with the Coastal Commission for an amendment to the Commission-issued coastal development permit and authorization for the proposed new development or modification to existing development. The Coastal Commission will determine whether the application for amendment shall be accepted for filing pursuant to the provisions of Title 14 California Code of Regulations, Section 13166.

C.    Any proposed development within the coastal zone that is subject to the City's jurisdiction upon certification of the LCP and that the City preliminarily approved before effective certification of the Malibu Local Coastal Program but for which a complete application has not been filed with the Coastal Commission for approval shall be resubmitted to the City through an application pursuant to this Certified Local Coastal Program. The standard for review for such an application shall be the requirements of this Certified Local Coastal Program. Any application fee paid to the Coastal Commission shall be refunded to the applicant.

**RJN - 64**

D.      Any proposed development within the certified area which the City preliminarily approved before effective certification of the Local Coastal Program and for which a complete application has been filed complete with the Coastal Commission may, at the option of the applicant, remain with the Coastal Commission for completion of review. Coastal Commission review of any such application shall determine consistency with the Certified Local Coastal Program. Projects which elect to obtain a coastal development permit from the Coastal Commission will remain under the jurisdiction of the Commission as set forth in Section 13.10.2 (B) of the Malibu LIP above.

E.      Alternatively, the applicant may withdraw the application filed with the Coastal Commission and resubmit it to the City through an application pursuant to the requirements of this Certified Local Coastal Program. The standard of review for such an application shall be the requirements of this Certified Local Coastal Program.

F.      Upon effective certification of a Local Coastal Program except as provided under A and B of this section, no applications for development shall be accepted by the Coastal Commission for development within the certified area.

## 13.11. PUBLIC HEARING REQUIRED AND PUBLIC COMMENT

A.      At least one public hearing shall be required on all appealable development as defined in Chapter 2 of the Malibu LIP (Definitions).

1.      Such hearing shall occur no earlier than seven (7) calendar days following the mailing of the notice required in Section 13.12 of the Malibu LIP. The public hearing may be conducted in accordance with existing City procedures or in any other manner reasonably calculated to give interested persons an opportunity to appear and present their viewpoints, either orally or in writing.

2.      If a decision on a development permit is continued by the City to a time which is neither (a) previously stated in the notice provided pursuant to Section 13.12 of the Malibu LIP, nor (b) announced at the hearing as being continued to a time certain, the local government shall provide notice of the further hearings (or action on the proposed development) in the same manner, and within the same time limits as established in Section 13565 of the California Code of Regulations.

B.      Any person may submit written comments to the Planning Manager on an application for a Coastal Development Permit, or on an appeal of a Coastal Development Permit, at any time prior to the close of the public hearing. If no public hearing is required, written comments may be submitted prior to the decision date specified in the public notice. Written comments shall be submitted to the Planning Manager who shall forward them to the appropriate person, commission, board or the Council and to the applicant. (Ord. 303 § 3, 2007)

## 13.12. PUBLIC NOTICE REQUIRED

### 13.12.1 Notice of Appealable Developments

A.      Within ten (10) calendar days of accepting an application for an appealable coastal development permit or at least seven (7) calendar days prior to the first public hearing on the development proposal, the City shall provide notice by first class mail of pending application for appealable development. This notice shall be provided to:

1.      Each applicant;

2.      All persons who have requested to be on the mailing list for that development project or for coastal decisions within the local jurisdiction;

3.      All property owners and residents within 100 feet of the perimeter of the parcel on which the development is proposed;

4.      Local, regional and state agencies known to be interested in the project including but not limited to: Los Angeles County, Ventura County, NPS, SMMC, CDPR, CDFG, NMFS, USFWS;

5.      The South Central Coast District of the Coastal Commission.

B.      The notice shall contain the following information:

1.      A statement that the development is within the coastal zone;

2.      The date of filing of the application and the name of the applicant;

3.      The number assigned to the application;

4.      A description of the development and its proposed location;

5.      The date, time and place at which the application will be heard by the city approving authority;

6.      A brief description of the general procedure concerning the conduct of hearing and local actions;

7.      The procedures for filing local and Coastal Commission appeals, including any local fees required.

## 13.12.2 Notice of Non-Appealable Developments

A.      Notice of an application for a coastal development permit that is not appealable but that requires a public hearing under local ordinance shall be provided as follows:

Within ten (10) calendar days prior to the City's hearing on the application, notice shall be provided as follows:

1.      If the matter is heard by the Planning Commission, notice shall be published in a newspaper of general circulation;

2.      Notice by first class mail to any person who has filed a written request to be on the mailing list for that development project or for coastal decisions within the City;

3.      Notice by first class mail to all property owners within 300 feet;

**RJN - 66**

4.        Notice by first class mail to residents within 100 feet of the proposed project;

5.        Notice by first class mail to local, regional and state agencies known to be interested in the project including but not limited to: Los Angeles County, Ventura County, NPS, SMMC, CDPR, CDFG, NMFS, USFWS;

6.        Notice by first class mail to the South Central Coast District of the Coastal Commission.

B.        Notice of an application for a coastal development permit that is not appealable and that does not require a public hearing under local ordinance shall be provided as follows:

Within ten (10) calendar days of accepting an application for a non-appealable coastal development permit or at least seven (7) calendar days prior to the City's decision on the application, notice shall be provided as follows:

1.        Notice by first class mail to any person who has filed a written request to be on the mailing list for that development project or for coastal decisions within the City;

2.        Notice by first class mail to all property owners and residents within 100 feet of the perimeter of the parcel on which the development is proposed;

3.        Notice by first class mail to local, regional and state agencies known to be interested in the project including but not limited to: Los Angeles County, Ventura County, NPS, SMMC, CDPR, CDFG, NMFS, USFWS;

4.        Notice by first class mail to the South Central Coast District of the Coastal Commission.

C.        The Notice required by both 13.12.2(A) and 13.12.2(B) shall contain the following information:

1.        A statement that the development is within the coastal zone;

2.        The date of filing of the application and the name of the applicant;

3.        The number assigned to the application;

4.        A description of development and its proposed location;

5.        The date the application will be acted upon by the City's governing body or decision-maker;

6.        The general procedure of the city concerning the submission of public comments either in writing or orally prior to the city's decision;

7.        A statement that a public comment period of sufficient time to allow for the submission of comments by mail will be held prior to the city's decision.

### 13.13.1 Applicability

A.      The planning manager may process consistent with the procedures in this chapter any coastal development permit application for the specific uses identified below, except a proposed coastal development permit that is appealable or is within the Commission's continuing jurisdiction as defined in Chapter 2 of the Malibu LIP (Definitions).

1.      Improvements to any existing structure;

2.      Any single-family dwelling;

3.      Lot mergers;

4.      Any development of four dwelling units or less that does not require demolition, and any other developments not in excess of one hundred thousand dollars ($100,000.00) other than any division of land;

5.      Water wells.

6.      Driveways or access road improvements required by the fire department to improve access to properties damaged or destroyed as part of the Woolsey Fire that do not meet the criteria for a de minimis waiver.

B.      Notwithstanding any other provisions of the LCP, attached or detached second dwelling units shall be processed as administrative permits, except that the approval of such permits shall be appealable to the Coastal Commission if the project is located in the appealable zone. (Ord. 445 § 4, 2019; Ord. 335 § 3, 2009; Ord. 303 § 3, 2007)

### 13.13.2 Filing Procedures

A.      Application for administrative permit shall be filed consistent with procedures for regular coastal development permits according to Section 13.6 of the Malibu LIP (Applications) of this chapter. The form shall allow the applicant an opportunity to state that in his or her opinion the work applied for falls within the criteria established by this section.

B.      Applications Not Thought to Be Administrative.

If the planning manager receives an application that is asserted to be for improvements or other development within the criteria established pursuant to this section and Public Resources Code Section 30624 and if the planning manager finds that the application does not qualify as such, he or she shall notify the applicant that the application cannot be processed administratively and must comply with regular permit procedures as provided in this chapter. The planning manager, with the concurrence of the applicant, may accept the application for filing as a regular permit pursuant to this chapter and shall adjust the application fees accordingly.

### 13.13.3 Public Notice

At the time the application is submitted for filing, the applicant must post, at a conspicuous place, easily read by the public which is also as close as possible to the site of the proposed development, notice that an application for a permit for the proposed administrative coastal development permit has been submitted to the city. Such notice shall contain a general description of the nature of the proposed development. The city shall furnish the applicant with a standardized form to be used for such posting. If the applicant fails to sign the declaration of posting, the planning manager shall refuse to file the application.

Notice of administrative coastal development permits shall also be made in the manner specified for non-appealable developments in section 13.12 of the Malibu LIP. (Ord. 303 § 3, 2007)

## 13.13.4 Criteria for Granting Administrative Permits

A.      The planning manager may approve or modify an application for improvements or other development governed by this section on the same grounds that the planning commission may approve an ordinary application and may include reasonable terms and conditions required for the development to conform with the policies of the LCP and the public access and recreation policies of Chapter 3 of the California Coastal Act of 1976.

B.      Permits issued for such developments shall be governed by the provisions of Sections 13156 (format) and 13158 (notice of receipt and acknowledgement) of the California Code of Regulations concerning the format, receipt, and acknowledgment of permits, except that references to "Commission Resolution" shall be deemed to refer to the planning manager's determination. A permit issued pursuant to this section and Public Resources Code Section 30624 shall contain a statement that it will not become effective until completion of the planning commission review of the permit pursuant to Section 13153. (Ord. 303 § 3, 2007)

## 13.13.5 Refusal to Grant - Notice to Applicant

If the planning manager determines not to grant an administrative permit based on a properly filed application under this section, the planning manager shall promptly mail written notice to this effect to the applicant with an explanation of the reasons for this determination. (Ord. 303 § 3, 2007)

## 13.13.6 Reports on Administrative Permits

The planning manager shall report in writing to the planning commission at each meeting the administrative coastal development permits that were approved under this section prior to the time of the mailing of the staff reports or recommendations for the meeting, with sufficient description of the work authorized to allow the planning commission to understand the development proposed to be undertaken. Copies of this report shall be available at the meeting and shall have been mailed to the planning commission and to all those persons wishing to receive such notification at the time of the regular mailing for the meeting and to the Coastal Commission. Any such permits approved following the deadline for the mailing shall be included in the report for the next succeeding meeting. If the majority of the planning commission members present so request, the issuance of an administrative permit governed by this section and Public Resources Code Section 30624 shall not become effective, but shall, if the applicant wishes to pursue the application, be treated as a regular coastal permit application under Section 13.6 of the Malibu LIP, subject to the provisions for hearing and appeal set forth in Sections 13.11 and 13.12 of the Malibu LIP. (Ord. 303 § 3, 2007)

## 13.14. EMERGENCY PERMITS

RJN - 69

In the event of an emergency as defined in Chapter 2 of the Malibu LIP (Definitions), an application for an emergency coastal development permit ("emergency permit") shall be made to the planning manager. The planning manager may issue an emergency permit in accordance with Coastal Act Section 30624 and the following:

    A.       Applications in cases of emergencies shall be made to the planning manager by letter or facsimile during business hours if time allows, by telephone or in person if time does not allow.

    B.       The information to be included in the application shall include the following:

          1.      The nature of the emergency;

          2.      The cause of the emergency, insofar as this can be established;

          3.      The location of the emergency;

          4.      The remedial, protective or preventative work required to deal with the emergency; and

          5.      The circumstances during the emergency that appeared to justify the course(s) of action taken, including the probable consequences of failing to take action.

    C.       The planning manager shall verify the facts, including the existence and nature of the emergency, insofar as time allows.

    D.       Prior to issuance of an emergency coastal development permit, when feasible, the planning manager shall notify, and coordinate with, the South Central Coast District office of the California Coastal Commission as to the nature of the emergency and the scope of the work to be performed. This notification shall be in person or by telephone.

    E.       The planning manager shall provide public notice of the proposed emergency, with the extent and type of notice determined on the basis of the nature of the emergency itself. The planning manager may grant an emergency permit upon reasonable terms and conditions, including an expiration date and the necessity for a regular permit application later, if the planning manager finds that:

          1.      An emergency exists and requires action more quickly than permitted by the procedures for administrative permits or for regular permits administered pursuant to the provisions of this chapter and Public Resources Code Section 30600.5 and the development can and will be completed within 30 days unless otherwise specified by the terms of the permit;

          2.      Public comment on the proposed emergency action has been reviewed if time allows; and

          3.      The work proposed would be temporary and consistent with the requirements of the city's certified LCP.

          4.      The work proposed is the minimum action necessary to address the emergency and, to the maximum extent feasible, is the least environmentally damaging temporary alternative for addressing the emergency.

5.      The planning manager shall not issue an emergency permit for any work that falls within the provisions of Public Resources Code Section 30519(b) since a coastal development permit application must be reviewed by the California Coastal Commission pursuant to provisions of Public Resources Code Section 30600.5.

F.      The emergency permit shall be a written document that includes the following information:

1.      The date of issuance;

2.      An expiration date;

3.      The scope of work to be performed;

4.      Terms and conditions of the permit;

5.      A provision stating that within 90 days of issuance of the emergency permit, a regular coastal development permit application shall be submitted and properly filed consistent with the requirements of this chapter;

6.      A provision stating that any development or structures constructed pursuant to an emergency permit shall be considered temporary until authorized by a follow-up regular coastal development permit and that issuance of an emergency coastal development permit shall not constitute an entitlement to the erection of permanent development or structures;

7.      A provision that states that: The development authorized in the emergency permit must be removed unless a complete application for a regular coastal development permit is filed within 90 days of approval of the emergency permit and said regular permit is approved. If a regular coastal development permit authorizing permanent retention of the development is denied, then the development that was authorized in the emergency permit, or the denied portion of the development, must be removed.

G.      The emergency permit may contain conditions for removal of development or structures if they are not authorized in a regular coastal development permit, or the emergency permit may require that a subsequent permit must be obtained to authorize the removal.

H.      An emergency permit issued for temporary housing pursuant to LIP 3.6(M) shall not be subject to subsections (F)(5) or (F)(7) above. (Ord. 445 § 4, 2019; Ord. 303 § 3, 2007)

**13.14.1 Reporting of Emergency Permits**

A.      The planning manager shall report in writing to the city council and to the California Coastal Commission at each meeting the emergency permits applied for or issued since the last report, with a description of the nature of the emergency and the work involved. Copies of this report shall be available at the meeting and shall have been mailed at the time that application summaries and staff recommendations are normally distributed to all persons who have requested such notification in writing.

B.    All emergency permits issued after completion of the agenda for the meeting shall be briefly described by the planning manager at the meetings and the written report required by Section 13.14.1 (A) of the Malibu LIP shall be distributed prior to the next succeeding meeting.

C.    The report of the planning manager shall be informational only; the decision to issue the emergency permit is solely at the discretion of the planning manager. (Ord. 303 § 3, 2007)

## 13.15. FINALITY OF CITY ACTION

A city decision on an application for a coastal development permit shall not be deemed complete until: (1) the local decision on the application has been made and all required findings have been adopted, including specific factual findings supporting the legal conclusions that the proposed development is or is not in conformity with the certified Local Coastal Program and, where applicable, with the public access and recreation policies of Chapter 3 of the Coastal Act; and (2) when all local rights of appeal have been exhausted.

## 13.16. NOTICE OF FINAL LOCAL GOVERNMENT ACTION

A.    Notice after Final City Action. Within seven calendar days of a local government completing its review and meeting the requirements of Section 13.15 of the Malibu LIP, the city shall notify by first class mail the South Central Coast District Office of the Coastal Commission and any persons who specifically requested notice of such action by submitting a self-addressed, stamped envelope to the local government (or, where required, who paid a reasonable fee to receive such notice) of its action. Such notice shall include conditions of approval and written findings and the procedures for appeal of the local decision to the Coastal Commission.

B.    Pursuant to Public Resources Code Section 30166.5, notwithstanding the requirements of Chapter 4.5 (commencing with Section 65920) of Division 1 of Title 7 of the Government Code, once the city assumes coastal development permitting authority pursuant to Public Resources Code Section 30166.5, no application for a coastal development permit shall be deemed approved if the city fails to take timely action to approve or deny the application.

## 13.17. EFFECTIVE DATE OF CITY ACTION

The city's final decision on an application for a coastal development permit that is appealable to the Coastal Commission shall become effective after the ten (10) working day appeal period to the Coastal Commission has expired unless either of the following occur:

A.    An appeal is filed in accordance with Section 13.20 of the Malibu LIP (Appeals);

B.    The notice of final local government action does not meet the requirements of Section 13.16 of the Malibu LIP.

When either of the circumstances in A or B occur, the Coastal Commission shall, within five calendar days of receiving notice of that circumstance, notify the city and the applicant that the effective date of the city action has been suspended. (Ord. 303 § 3, 2007)

## 13.18. FORMAT OF PERMITS

## 13.18.1 Content of Permits

Permits shall be issued in a form signed by the planning manager, and shall include:

    A.    A statement setting out the reasons for the approval of the permit;

    B.    Any other language or drawings, in full or incorporated by reference, that are consistent with the decision, and required to clarify or facilitate carrying out the intent of the city;

    C.    Any conditions approved by the city;

    D.    Such standard provisions as shall have been approved by resolution of the city;

    E.    A statement that the permit runs with the land and binds all future owners of the property;

    F.    A statement that the permit shall not become effective until the city receipt of acknowledgment as provided in Section 13.18.2 of the Malibu LIP.

    G.    The time for commencement of the approved development except that where the city has not imposed any specific time for commencement of development pursuant to a permit, the time for com-

mencement shall be two years from the date of the city vote upon the application. Each permit shall contain a statement that any request for an extension of the time of commencement must be applied for prior to expiration of the permit. (Ord. 303 § 3, 2007)

## 13.18.2 Notice of Receipt and Acknowledgment

    A.    Development shall not commence until an approved permit becomes effective.

    B.    No approved permit shall become effective until a copy of the permit has been returned to the city, upon which copy all permittees or authorized agent(s) have acknowledged that they have received a copy of the permit and have accepted its contents.

    C.    Each permit approved by the city shall be issued to the applicant with a blank acknowledgment to be signed by each permittee.

    D.    The acknowledgment should be returned within ten (10) working days following issuance of the permit.

    E.    A permit shall not be issued pursuant to this section unless the applicant has satisfied all prior to issuance conditions. Prior to issuance conditions are those conditions that are identified in the permit as conditions that must be complied with prior to issuance of the permit. After approval of a permit, the planning manager shall notify the permit

applicant of those conditions that have been designated as prior to issuance conditions. (LCPA 05-001 § 3 (part), 2006)

## 13.19. PROCEDURES FOR RECORDATION OF LEGAL DOCUMENTS

All coastal development permits subject to conditions of approval pertaining to public access and open space or conservation easements shall be subject to either of the following procedures:

A.      The executive director of the Coastal Commission shall review and approve all legal documents specified in the conditions of approval of a coastal development permit for public access and conservation/open space easements.

1.      Upon completion of permit review by the city and prior to the issuance of the permit, the city shall forward a copy of the permit conditions and findings of approval and copies of the legal documents to the executive director of the Commission for review and approval of the legal adequacy and consistency with the requirements of potential accepting agencies;

2.      The executive director of the Commission shall have fifteen (15) working days from receipt of the documents in which to complete the review and notify the applicant of recommended revisions if any;

3.      The city may issue the permit upon expiration of the fifteen (15) working day period if notification of inadequacy has not been received by the city within that time period;

4.      If the executive director has recommended revisions to the applicant, the permit shall not be issued until the deficiencies have been resolved to the satisfaction of the executive director; or

B.      If the city requests, the Commission shall delegate the authority to process the recordation of the necessary legal documents to the city if the requirements of 14 Cal. Code of Regulations, section 13574(b) are met. If this authority is delegated, upon completion of the recordation of the documents, the city shall forward a copy of the permit conditions and findings of approval and copies of the legal documents pertaining to the public access and open space conditions to the executive director of the commission.

## 13.20. APPEALS

Development pursuant to an approved coastal development permit shall not commence until the coastal development permit is effective. The coastal development permit is not effective until all appeals, including those to the Coastal Commission, have been exhausted. In the event that the Coastal Commission denies the permit or issues the permit on appeal, the coastal development permit approved by the city is void.

### 13.20.1 Local Appeals

A.      A decision or any portion of the decision made by the planning manager under the provisions of this chapter may be appealed to the planning commission by an aggrieved person as defined in Chapter 2 of the Malibu LIP (Definitions). Any decision made by the planning commission may be appealed by an aggrieved person to the city council.

B.      Appeals shall be addressed to the appellate body on a form prescribed by such body, and shall state the basis of the appeal. An appeal shall be filed with the city clerk within ten (10) days following the date of action for which appeal is made. Appeals may be accompanied by the filing fee as specified by the city council, and shall be processed and noticed in the same manner as the original coastal development permit application.

C.      A copy of the appeal shall be sent by the city to the applicant by certified mail and to the address listed on the application if it is different, within one week of its filing.

D.      Upon receipt in proper form of an appeal, the appeal shall be set for the appropriate hearing body.

E.      Public notice of an appeal hearing shall conform to the manner in which the original notice was given.

F.      The planning commission and city council, respectively, may, upon the affirmative vote of a majority of its members, appeal a decision made by the manager or planning commission under the provisions of this chapter. There shall be no appeal fee for such an appeal brought by either the planning commission or the city council. (Ord. 303 § 3, 2007)

## 13.20.2 Appeals to the Coastal Commission

A.      Within ten (10) working days of Coastal Commission receipt of the notice of final action, an appealable coastal development permit, as defined in Chapter 2 of the Malibu LIP (Definitions), may be appealed to the Coastal Commission by an aggrieved person who has exhausted local appeals or by any two members of the Coastal Commission.

B.      For appealable coastal development permits as defined in Chapter 2 of the Malibu LIP (Definitions), an appellant shall be deemed to have exhausted local appeals and shall be qualified as an aggrieved person where the appellant has pursued his or her appeal to the appellate bodies identified in this Chapter. Exhaustion of all local appeals shall not be required if any of the following occur; however, no appeal shall be accepted by the Coastal Commission until a Notice of Final Action is received in accordance with Section 13.16.

1.      The City requires an appellant to appeal to more local appellate bodies than have been certified as appellate bodies for permits in the coastal zone, in this Chapter.

2.      An appellant was denied the right of the initial local appeal by a City ordinance which restricts the class of persons who may appeal a local decision.

3.      An appellant was denied the right of local appeal because City notice and hearing procedures for the development did not comply with the provisions of this Chapter.

4.      The City charges an appeal fee for the filing or processing of local appeals.

C.      Where an appealable coastal development permit is appealed by any two (2) members of the Coastal Commission, there shall be no requirement of exhaustion of local appeals; however, no appeal shall be filed until a Notice of Final Action is received by the Coastal Commission in accordance with Section 13.16. Provided, however, that the City may provide, by ordinance, that notice of Coastal Commissioner appeals may be transmitted to the City Council, and the appeal to the Coastal Commission may be suspended pending a decision on the merits by the City Council. If the decision

of the City Council modifies or reverses the previous decision, the Coastal Commissioners shall be required to file a new appeal from that decision. (Ord. 303 § 3, 2007)

## 13.21. EXPIRATION OF COASTAL DEVELOPMENT PERMIT

Unless the permit states otherwise, a Coastal Development Permit shall expire two years from its date of approval if the development has not commenced during that time. The approving authority may grant a reasonable extension of time for due cause. Extensions shall be requested in writing by the applicant or authorized agent prior to expiration of the two-year period.

## 13.22. PERMIT AMENDMENTS

Upon application by the permittee, a Coastal Development Permit may be amended or extended. Application for an amendment shall be accomplished in the same manner specified by this chapter for the initial application of the Coastal Development Permit. All sections of this Chapter dealing with the specific type of Coastal Development Permit shall apply to permit amendments.

## 13.23. REAPPLICATION

An application or local appeal may be denied and no further application for the denied request shall be filed in the ensuing twelve months, except as otherwise specified at the same time of denial, unless the application has been substantially modified to address the concerns leading to the original denial. (Ord. 303 § 3, 2007)

## 13.24. REVOCATION

If the planning manager initiates revocation proceedings as provided below, the Planning Commission shall hold a public hearing upon the question of revocation of a coastal development permit granted under or pursuant to the provisions of this Chapter. Notice of such hearing shall be the same as would be required for a new coastal development permit. (Ord. 303 § 3, 2007)

### 13.24.1.        Grounds for Revocation of a Permit

The grounds for revocation of a permit shall be:

A.      Intentional inclusion of inaccurate, erroneous or incomplete information in connection with a coastal development permit application, where the City finds that accurate and complete information would have caused additional or different conditions on a permit or denial of an application;

B.      Failure to comply with the noticing provisions of this Chapter where the views of the person(s) not notified were not otherwise made known to the City and could have caused the City to require additional or different conditions on a permit or deny an application.

### 13.24.2 Initiation of Proceedings

RJN - 76

Any person who did not have an opportunity to fully participate in the original permit proceedings because of the reasons stated in (2) above, may request revocation of a permit by application to the planning manager specifying, with particularity, the grounds for revocation. The planning manager shall review the stated grounds for revocation and, unless the request is patently frivolous and without merit, shall initiate revocation proceedings. The planning manager may initiate revocation proceedings on his or her own motion when the grounds for revocation have been established pursuant to the provisions of Section 13.24.1 of the Malibu LIP. (Ord. 303 § 3, 2007)

### 13.24.3 Suspension of Permit

Where the planning manager determines in accord with Section 13.24.1 of the Malibu LIP that grounds exist for revocation of a permit, the operation of the permit shall be automatically suspended until the Planning Commission votes to deny the request for revocation. The planning manager shall notify the permittee by mailing a copy of the request for revocation and a summary of the procedures set forth in this article, to the address shown in the permit application. The planning manager shall also advise the applicant in writing that any development undertaken during suspension of the permit may be in violation of the certified LCP and the California Coastal Act of 1976 and subject to the penalties set forth in Public Resources Code, Sections 30820 through 30823. (Ord. 303 § 3, 2007)

### 13.24.4 Hearing on Revocation

A.      At the next regularly scheduled meeting, and after notice to the permittee and any persons the planning manager has reason to know would be interested in the permit or revocation, the planning manager shall report the request for revocation to the Planning Commission with a preliminary recommendation on the merits of the request.

B.      The person requesting the revocation shall be afforded a reasonable time to present the request and the permittee shall be afforded a like time for rebuttal.

C.      The Planning Commission shall ordinarily vote on the request at the same meeting, but the vote may be postponed to a subsequent meeting if the commission wishes the Manager to perform further investigation.

D.      A permit may be revoked by a majority vote of the members of the Planning Commission present if it finds that any of the grounds specified in section 13.24.1 of the Malibu LIP exist. If the commission finds that the request for revocation was not filed with due diligence, it shall deny the request.

E.      A Planning Commission action to revoke a coastal development permit may be appealed to the City Council pursuant to Section 13.20 of the Malibu LIP of this Chapter. (Ord. 303 § 3, 2007)

### 13.25. ENFORCEMENT AND PENALTIES

A.      In addition to all other available remedies, the City may seek to enforce the provisions of the LCP and the Coastal Act pursuant to the provisions of Public Resources Code section 30800—30822.

B.      Any person who performs or undertakes development in violation of the LCP or inconsistent with any coastal development permit previously issued may, in addition to any other penalties, be civilly liable in accordance with the provisions of Public Resources Code Division 20 Section 30820.

RJN - 77

C.      Pursuant to Public Resources Code section 30811, the planning manager may, after a public hearing, order restoration of a site if it finds that the development has occurred without a coastal development permit from the appropriate authority, the development is inconsistent with the provisions of the Coastal Act, and the development is causing continuing resource damage. Pursuant to Public Resources Code section 30821.6, any person who intentionally or negligently violates a restoration order may be civilly liable for a penalty for each day in which the violation persists. (Ord. 303 § 3, 2007)

## 13.26. VARIANCES

The purpose of this section is to provide a mechanism for applicants to make an application for a coastal development permit variance from standards or requirements of the Malibu LIP and to provide specific findings for approval or denial of variances. A variance shall not be granted which confers a special privilege inconsistent with the limitations upon other properties in the same vicinity and zone in which the subject property is situated or which authorizes a use or activity which is not otherwise expressly authorized by the zoning regulations governing that parcel of property.

### 13.26.1 Application

Application for a variance shall be filed in the same manner as for a coastal development permit.

### 13.26.2 Applicability

Variances shall be decided in the same manner as for regular coastal development permits consistent with this chapter. Variances from the requirements of Section 17.4.2 or Section 17.4.3 of the LIP shall not be granted under this Chapter; rather, waivers from compliance may be granted if the requirements of Section 17.4.2 (C)(3) or 17.4.3 (C)(3), as applicable, are met.

### 13.26.3 Hearings and Notice

All applications for variances require a public hearing consistent with procedures of this Chapter. Upon receipt in proper form of a variance application, a public hearing shall be set and notice of such hearing given in the same manner as for regular coastal development permits.

### 13.26.4 Investigation

An investigation of facts for each variance shall be made under the direction of the Director to assure that the action on each application is consistent with the intended purpose of the LCP.

### 13.26.5 Findings

Following a public hearing, the Planning Commission shall record the decision in writing. The Commission may approve and/or modify an application for a variance in whole or in part, with or without conditions, only if it makes all of the following findings of fact supported by substantial evidence that:

A.      There are special circumstances or exceptional characteristics applicable to the subject property, including size, shape, topography, location, or surroundings such that strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under the identical zoning classification.

B.      The granting of such variance will not be detrimental to the public interest, safety, health or welfare, and will not be detrimental or injurious to the property or improvements in the same vicinity and zone(s) in which the property is located.

C.      The granting of the variance will not constitute a special privilege to the applicant or property owner.

D.      The granting of such variance will not be contrary to or in conflict with the general purposes and intent of this Chapter, nor to the goals, objectives and policies of the LCP.

E.      For variances to environmentally sensitive habitat area buffer standards or other environmentally sensitive habitat area protection standards, that there is no other feasible alternative for siting the structure and that the development does not exceed the limits on allowable development area set forth in Section 4.7 of the Malibu LIP.

F.      For variances to stringline standards, that the project provides maximum feasible protection to public access as required by Chapter 12 of the Malibu LIP.

G.      The variance request is consistent with the purpose and intent of the zone(s) in which the site is located. A variance shall not be granted for a use or activity which is not otherwise expressly authorized by the zone regulation governing the parcel of property.

H.      The subject site is physically suitable for the proposed variance.

I.      The variance complies with all requirements of state and local law.

J.      A variance shall not be granted that would allow reduction or elimination of public parking for access to the beach, public trails or parklands. (Ord. 303 § 3, 2007)

## 13.26.6 Revocation

If the Planning Commission has reason to believe that grounds for revocation of a variance may exist, the Planning Commission shall proceed consistent with coastal development permit procedures in this chapter. (Ord. 303 § 3, 2007)

## 13.27 SITE PLAN REVIEW AND MINOR MODIFICATIONS

The purpose of this section is to provide a mechanism for the planning manager, in the process of reviewing a coastal development permit, to consider specified minor changes to standards or requirements of the LCP as applied to the coastal development permit. In reviewing a coastal development permit the planning manager can process a site plan review or minor modifications to approve a deviation from standards required in the LCP for the specific situations listed in sections 13.27.1 (A) and (B).

Application for a site plan review or minor modification shall be filed as part of the coastal development permit and shall be processed consistent with provisions of this chapter. (Ord. 303 § 3, 2007)

## 13.27.1 Applicability

A.      The planning manager may consider only the following applications for site plan review:

1.      Height increases over the base district maximum of 18 feet up to a maximum of 28 feet in height.

2.      Remedial Grading, which is grading necessary to mitigate an environmental hazard as recommended by a geotechnical or soils report prepared by a licensed professional geologist or geotechnical engineer and approved by the City Geotechnical staff.

Within the Malibu Country Estates Overlay District, remedial grading may also be permitted to restore a building site as constructed in the original grading plan for Tract 30134. The purpose of all remedial grading within the Malibu Country Estates Overlay District shall be to maintain the existing building pads and slopes.

3.      Non-visually permeable fences except for those required to comply with LCP policies and standards regarding protection of environmentally sensitive habitat and scenic and visual resources.

4.      Structures constructed on slopes greater than 3:1 but less than 2 1/2:1, except for the Malibu Country Estates Overlay District where this provision shall not be available.

5.      Grading not exceeding 100 cubic yards total cut and fill within the Malibu Country Estates Overlay District.

6.      Satellite or communication devices and antennas within the Malibu Country Estates Overlay District which exceed one meter in diameter and that project above rooflines or are visible from public streets or sidewalks, where necessary to accommodate the technical requirements of the equipment.

7.      Wireless telecommunications antennae and facilities (pursuant to the provisions of Section 3.14.1 (B) of the Malibu LIP) that comply with the Most Restrictive Design Standards set forth in Section 3.16.1 (F) of the Malibu LIP.

8.      For institutional development, height increases over the base district maximum of 18 feet up to a maximum of thirty-five (35) feet in height for flagpoles, satellite dishes, safety railings, elevator shafts, stairwells, church spires, and belfries where consistent with all applicable certified Local Coastal Program policies and development standards. Roof-mounted mechanical equipment shall be integrated into the roof design, screened, and may project no more than two feet higher than the structure roof height (screens included).

B.      The planning manager may grant minor modification permits authorizing the following:

1.      Reduce setback and open space requirement by no more than 20%, except that front yard setbacks may be reduced by no more than 50% and side setbacks shall not be reduced where part of a required view corridor.

2.      Approve alternative to water saving fixture requirements upon the recommendation of the Building Official.

3.      Approve a stringline modification request authorizing the use of an alternative stringline where the application of the stringline rule results in a stringline substantially inconsistent with adjacent development. The modification can result in selecting a different stringline end point than the nearest adjacent corner on the

closest upcoast or downcoast property, or selecting the stringline end point on the next upcoast or downcoast property, which the Planning Manager has determined appropriate. (Ord. 373 § 3, 2013; Ord. 303 § 3, 2007)

### 13.27.3 Notice

Notice of the request shall be given consistent with provisions of this chapter for coastal development permits.

### 13.27.4 Investigation

The Planning Manager shall investigate the site plan review or minor modification application, including consultation with all appropriate City staff and specialists including the Building Official, City Engineer, City Biologist, City Geologist, City Archeologist and a Coastal Morphologist. (Ord. 303 § 3, 2007)

### 13.27.5 Findings

    A.    The Planning Manager may approve or conditionally approve a site plan review application only if the Planning Manager affirmatively finds that the proposal meets all of the following:

        1.    That the project is consistent with policies and provisions of the Malibu LCP.

        2.    That the project does not adversely affect neighborhood character.

        3.    That the project provides maximum feasible protection to significant public views as required by Chapter 6 of the Malibu LIP.

The proposed project complies with all applicable requirements of state and local law.

    B.    The Planning Manager may approve a minor modification application only if the Planning Manager affirmatively finds that the proposal meets all of the following:

        1.    That the project is consistent with the policies of the Malibu LCP.

        2.    That the project does not adversely affect neighborhood character.

        3.    The proposed project complies with all applicable requirements of state and local law.

        4.    If the request involves a stringline modification, that the proposal conforms to the following:

            a.    The development will not be closer to the ocean than a structure of the same type on either adjacent property or a structure used in the stringline determination;

            b.    The development will not result in conferring a privilege not enjoyed by an adjacent structure;

RJN - 81

c.     Strict compliance with the requirements of Section 3.6.G (3) of the LIP would deprive the property owner of reasonable use of the structure or a use which is enjoyed by one or more adjacent structures; and

d.     The project provides maximum feasible protection to public access, as required by Chapter 12 of the LIP. (Ord. 303 § 3, 2007)

## 13.27.6 Processing

All Site Plan Reviews and Minor Modifications shall comply with requirements for processing of coastal development permits and appeals consistent with this Chapter.

## 13.28 DEVELOPMENT AGREEMENTS

This section is intended to provide procedures and requirements for consideration of development agreements for the purposes specified in and as authorized by the Government Code. The Planning Commission may recommend and the City Council may enter into a development agreement for the development of real property with any person having a legal or equitable interest in such property.

## 13.28.1 Applicability

Development Agreements shall be processed as Amendments to the Local Coastal Program consistent with procedures in Chapter 19 of the Malibu LIP. Approval by the Council of a development agreement shall be by ordinance and shall not take effect until and unless certified by the California Coastal Commission as an amendment to the LCP. Upon effective certification of a Development Agreement by the Coastal Commission through a Local Coastal Program Amendment, any land use designation changes in the Development Agreement shall be redesignated in the LCP.

## 13.28.2 Initiation of Hearings

Hearings on a development agreement may be initiated:

A.     If the City Council instructs the Commission to set the matter for a hearing, report and recommendation; or

B.      Upon the initiative of the Commission; or

C.      Upon the filing of an application as provided for by Chapter 19 of the Malibu LIP.

## 13.28.3 Hearing and Notice

Public Hearing and Notice requirements shall be as required in Chapter 19 of the Malibu LIP for LCP Amendments.

## 13.28.4 Terms, Conditions, Restrictions and Requirements

A development agreement entered into by the Council may include terms and conditions, restrictions and requirements; provided, however, that such terms, conditions, restrictions or requirements shall not be contrary to the policies and regulations of the certified LCP applicable to the proposed development.

### 13.28.5 Council Hearing and Notice

After receipt of the Commission's recommendation, the Council shall hold a public hearing and shall give notice of such public hearing pursuant to the procedure set forth in Section 13.28.3 of the Malibu LIP.

### 13.28.6 Council Action

The Council may approve, modify or disapprove a Planning Commission recommendation involving a development agreement, provided that any modification of the development agreement by the Council not previously considered by the Planning Commission during its hearing shall first be referred to the Planning Commission for report and recommendation, but the Commission shall not be required to hold a public hearing thereon. Failure of the Planning Commission to report within 40 days after such referral, or such longer period of time designated by the Council, shall be deemed to be an approval by the Planning Commission of the proposed modification.

### 13.28.7 Amendment or Cancellation

An application to amend or to cancel in whole or in part a development agreement may be made by mutual consent of all parties to the agreement or their successors in interest and shall be submitted and processed consistent with Chapter 19 of the Malibu LIP as LCP Amendment. Procedures for amendment or cancellation shall be the same as provided in this Chapter for initiation and consideration of such agreement and such amendment or cancellation shall not take effect unless and until effectively certified by the Coastal Commission.

## 13.29 ONSITE WASTEWATER TREATMENT SYSTEM COASTAL DEVELOPMENT PERMITS

### 13.29.1 Applicability

These regulations shall apply to all applications for Onsite Wastewater Treatment Systems (OWTS) for failed systems or to comply with Regional Water Quality Control Board requirements to upgrade existing systems for existing single family residential uses that does not include other development as defined in Chapter 2 of the Malibu LIP (Definitions). An application for an OWTS Coastal Development Permit (OWTS CDP) shall be made to the Planning Manager.

A.      Applications for OWTS CDPs shall be to the Planning Manager on forms provided by the Planning Division.

B.      The Planning Manager shall refer the application to the City's Environmental Health Administrator Building Division Manager and City Biologist for verification of the facts and design of the proposed system.

C.      Public notice for an OWTS CDP within the Appeal Zone shall be provided in the same manner as for an administrative coastal development permit. Public notice shall be provided for an OWTS CDP outside of the Appeal Zone by posting notice on the project site, at a conspicuous place easily read by the public which is also as close as possible to the site of the proposed development. Such notice shall contain a general description of the nature of the proposed development. (Ord. 303 § 3, 2007)

## 13.29.2 Findings and Permit Issuance

The Planning Manager may approve an application for an OWTS CDP if the following findings can be made:

    A.       The proposed OWTS is consistent with the LCP and all applicable LCP provisions, local laws and regulations regarding OWTSs; and

    B.       The proposed OWTS does not require a new or upgraded shoreline protective device; and

    C.       The proposed OWTS is necessary to protect public health and/or improve water quality; and

    D.       The proposed OWTS CDP has been conditioned in accordance with the LCP.

Upon approving an OWTS CDP, the Planning Manager shall issue a written document that at a minimum includes the following information:

    A.       Location of the project;

    B.       The date of issuance;

    C.       An expiration date;

    D.       The scope of work to be performed;

    E.       Terms and conditions of the permit; and

    F.       Findings. (Ord. 303 § 3, 2007)

## 13.29.3 Reporting of OWTS CDPs

    A.       The Planning Manager shall report in writing to the Planning Commission at each meeting the permits approved under this section in the same manner as for an administrative permit, consistent with LIP Section 13.13.6.

    B.       Appeals. Local appeals shall be processed consistent with LIP Section 13.20.1; notice of all local appeals shall be provided in the same manner as for an administrative permit. If the project is located in the appealable zone, Coastal Commission appeals shall be processed consistent with LIP Section 13.20.2. (Ord. 303 § 3, 2007)

## 13.30 HOUSING ACCESSIBILITY—REQUEST FOR REASONABLE ACCOMMODATION

    A.       Purpose and Intent. This section sets forth the procedures to request reasonable accommodation for persons with disabilities seeking equal access to housing under the Federal Housing Act and the California Fair Employment and Housing Act (the Acts) in the application of zoning laws and other land use regulations, policies and procedures.

It is the intent of this section that, notwithstanding time limits provided to perform specific functions, application review, decision making, and appeals proceed expeditiously, especially where the request is time sensitive, and so as to reduce impediments to equal access to housing.

B.      Applicability.

1.      A request for reasonable accommodation may be made by any person with a disability, his/her representative or any property owner, when the application of a zoning law or other land use regulation, policy or practice acts as a barrier to fair housing opportunities.

2.      A request for reasonable accommodation may include a modification or exception to the rules, standards, practices and procedures regulating the siting, development or use of housing or housing-related facilities that would eliminate regulatory barriers and provide a person with a disability equal opportunity to housing of their choice.

3.      A person with a disability is a person who has a physical or mental impairment that substantially limits or substantially limits one or more major life activities; anyone who is regarded as having such impairment; or anyone who has a record of such impairment. This section shall only apply to those persons who are defined as disabled under the Acts.

C.      Application Submittal.

1.      Any person with a disability may file an application for a request for reasonable accommodation with the Planning Department, on a form approved by the Planning Director and shall contain the following information, accompanied by a fee established by resolution of the City Council:

     a.      Applicant's and/or property owner's name, mailing address, daytime phone number and email address;

     b.      The address of the property for which the request is being made;

     c.      Current actual use of the property;

     d.      The basis for the claim that the individual is considered disabled under the Acts;

     e.      The specific code provision, regulation, procedure or policy of the LCP from which reasonable accommodation is being requested including an explanation of how application of the existing code provision, regulation, procedure or policy precludes reasonable accommodation;

     f.      The length of time the reasonable accommodation is necessary;

     g.      An explanation of why the reasonable accommodation is necessary to make the specific property accessible to the individual;

h.      A determination of whether or not the request would result in adverse impacts to wetlands, environmentally sensitive habitat area, public access, public views and/or other coastal resources;

i.      A site plan or illustrative drawing showing the proposed accommodation; and

j.      Any other information required to make the findings required by subsection (F)(5) of this section consistent with the Acts.

2.      A request for reasonable accommodation may be filed at any time that the accommodation may be necessary to ensure equal access to housing. If the project for which the request for reasonable accommodation is being made also requires a CDP, then the applicant shall file the application submittal information together with the application for the CDP for concurrent review.

3.      A reasonable accommodation does not affect or negate an individual's obligations to comply with other applicable regulations not at issue with the requested accommodation.

4.      If an individual needs assistance in making the request for reasonable accommodation, the City shall provide assistance to ensure that the process is accessible.

D.      Reviewing Authority.

1.      Applications for reasonable accommodation shall be reviewed by the Director or his/her designee, if no approval is sought other than the request for reasonable accommodation. The Director may, in his/her discretion, refer applications that may have had a material effect on surrounding properties (e.g., location of improvements in the front yard, would violate a specific condition of approval, improvements are permanent) directly to the Planning Commission for a decision.

2.      Applications for reasonable accommodation submitted for concurrent review with a CDP application shall be reviewed by the authority reviewing the CDP application.

E.      Findings. A written decision to grant, grant with conditions, or deny a request for reasonable accommodation shall make all of the following findings:

1.      The housing, which is the subject of the request, will be occupied by a person with a disability as defined in subsection (B)(3) above.

2.      The approved reasonable accommodation is necessary to make housing available to a person with a disability as defined in subsection (B)(3) above.

3.      The approved reasonable accommodation would not impose an undue financial or administrative burden on the City.

4.      The approved reasonable accommodation would not require a fundamental alteration in the nature of the LCP.

**RJN - 86**

5.      The approved reasonable accommodation would not adversely impact coastal resources.


6.      The project that is the subject of the approved reasonable accommodation conforms to the applicable provisions of the LCP and the applicable provisions of this section, with the exception of the provision(s) for which the reasonable accommodation is granted.


F.      Decision.


1.      The Director shall consider an application, and issue a written determination within forty-five (45) calendar days of the date of receipt of a completed application. If necessary, to reach a determination on any request for reasonable accommodation, the review authority may request further information from the applicant consistent with this section, specifying in detail what information is required. In the event a request for further information is made, the applicable time period to issue a written determination shall be stayed until the applicant responds to the request.


2.      At least ten (10) calendar days before issuing a written determination on the application, the Director shall mail notice to the applicant and all abutting property owners and occupants and those immediately across the street that the City will be considering the application and inviting written comments on the requested accommodation.


3.      Upon referral from the Director, the Planning Commission shall consider an application at the next reasonably available public meeting after submission of an application for reasonable accommodation. The Commission shall issue a written determination within forty-five (45) calendar days after such public meeting.


4.      Notice of Planning Commission meeting to review and act on the application shall be made in writing, ten (10) calendar days prior to the meeting and mailed to the applicant and all abutting property owners and occupants as well as those immediately across the street.


5.      The review authority's written decision shall set forth the findings, any conditions or approval, notice of the right to appeal and the right to request reasonable accommodation on the appeals process, if necessary. The decision shall be mailed to the applicant, and when the approving authority is the Director, to any person having provided written or verbal comment on the application.


6.      The written decision of the reviewing authority shall be final unless appealed in the manner set forth in subsection (F)(8) below.


7.      While a request for reasonable accommodation is pending, all laws and regulations otherwise applicable to the property that is the subject of the request shall remain in full force and effect.


8.      Where the improvements or modification approved through reasonable accommodation would generally require a variance, a variance shall not be required.


G.      Conditions of Approval. In granting a request for reasonable accommodation, the reviewing authority may impose any conditions of approval deemed reasonable and necessary to ensure that the reasonable accommodation would comply with the findings required by subsection E of this section.


H.      Appeals. The process set forth in Section 13.20 shall apply, as supplemented by the following:

1.      The Planning Commission or the City Council, as applicable, shall hear the matter and render a determination as soon as reasonably practicable, but in no event later than ninety (90) calendar days after an appeal has been filed. All determinations shall address and be based upon the same findings required to be made in the original determination from which the appeal is taken.

2.      The City shall provide notice of an appeal hearing to the applicant, adjacent property owners and any other person requesting notification at least ten (10) calendar days prior to the hearing. The appeal authority shall announce its findings within thirty (30) calendar days of the hearing, unless good cause is found for an extension, and the decision shall be mailed to the applicant. The Council's action shall be final.

3.      If an individual needs assistance in filing an appeal on an adverse decision, the City shall provide assistance to ensure that the appeals process is accessible.

4.      Nothing in this procedure shall preclude an aggrieved individual from seeking other state or federal remedy available.

I.      Waiver of Time Periods. Notwithstanding any provisions in this section regarding the occurrence of any action within a specified period of time, the applicant may request additional time beyond that provided for in this section or may request a continuance regarding any decision or consideration by the City of a pending appeal. Extensions of time sought by applicants shall not be considered delay on the part of the City, shall not constitute failure by the City to provide for prompt decisions on applications and shall not be a violation of any required time period set forth in this section.

J.      Discontinuance. Unless the review authority determines a reasonable accommodation runs with the land, a reasonable accommodation shall lapse if the rights granted by it are discontinued for one hundred eighty (180) consecutive days. If the person initially occupying a residence or business vacate, the reasonable accommodation shall remain in effect only if the Director determines that:

1.      The modification is physically integrated into a structure and cannot easily be removed or altered to comply with Chapter 3 of the Local Implementation Plan;

2.      Its removal would constitute an unreasonable financial burden; and

3.      The accommodation is necessary to give another disabled individual an equal opportunity to enjoy the dwelling or business.

a.      The Director may request the applicant or his or her successor-in-interest to the property to provide documentation that subsequent occupants are persons with disabilities. Failure to provide such documentation within ten (10) days of the date of a request by the Director shall constitute grounds for discontinuance by the City of a previously approved reasonable accommodation. (Ord. 449 § 4, 2019)

Case 2:20-cv-08781-PA-MRW   Document 13-1   Filed 12/03/20   Page 89 of 96   Page ID #:193

View the mobile version.

RJN – 89

# EXHIBIT B



# City of Malibu

23825 Stuart Ranch Road · Malibu, California · 90265-4861
Phone (310) 456-2489 · Fax (310) 456-3356 · www.malibucity.org

## PLANNING DEPARTMENT - UNIFORM APPLICATION
The City of Malibu will not accept incomplete applications.

### GENERAL INFORMATION

PROJECT ADDRESS: _____

PROPERTY OWNER: First:_____ Last: _____

OWNER ADDRESS:_____

CITY:_____ STATE:_____ ZIP:_____

OWNER PHONE #:_____

OWNER EMAIL: _____

*OWNER EMAIL REQUIRED

APPLICANT / CONTACT: First:_____ Last: _____

APPLICANT ADDRESS:_____

CITY:_____ STATE:_____ ZIP:_____

APPLICANT PHONE #: _____

APPLICANT EMAIL: _____


TENANT: (Commercial only)_____

TENANT / CONTACT: First:_____ Last: _____

TENANT ADDRESS:_____ Unit #:_____

CITY:_____ STATE:_____ ZIP:_____

TENANT PHONE #:_____

TENANT EMAIL: _____

**Is the subject property located within a homeowners/property owners association?**

Yes ❑     No ❑     If yes, please list: _____

### PROJECT DESCRIPTION

_____
_____
_____
_____

### CODE ENFORCEMENT

**If this application pertains to a Code Enforcement case, the City of Malibu Code Enforcement Officer must sign this application prior to submittal**.

Code Enforcement Officer Comments:

Code Enforcement Officer Signature:_____ Date:_____ Fees:_____

## FEES

**Planning Fees**
❑ Archaeology Review (Phase ___)      _____

❑ Over the Counter
    ❑ Level1  ❑ Level II            _____

❑ Solar Panels
    ❑ Roof ❑ Ground             _____

❑ Primary View Determination        _____

❑ Sign Permit
    ❑ Indv. ❑ Temp ❑ Master       _____

**City Specialists Fees**
❑ Biology
    $_____              _____
❑ Coastal Engineering
    $_____              _____
❑ Doc Ret Fee $26.00             _____
❑ Geology
    $_____              _____
❑ Doc Ret Fee $26.00             _____

❑ Environmental Health
    $_____              _____
❑ Doc Ret Fee $26.00             _____
❑ Public Works
    $ _____             _____

*See associated submittal checklists for the following applications: Administrative Plan Review, Certificate of Compliance Review, Coastal Development Permit, Conditional Use Permit, and Wireless Telecommunication Facilities.

## INDEMNIFICATION CLAUSE

The property owners, and their successors in interest, shall indemnify and defend the City of Malibu and its officers, employees and agents from and against all liability and costs relating to the City's actions concerning this project, including (without limitation) any award of litigation expenses in favor of any person or entity who seeks to challenge the validity of any of the City's actions or decisions in connection with this project.  The City shall have the sole right to choose its counsel and property owners shall reimburse the City's expenses incurred in its defense of any lawsuit challenging the City's actions concerning this project.

_____     _____     _____
PROPERTY OWNER SIGNATURE          PROPERTY OWNER NAME (PRINT)          DATE

## APPLICANT/CONTRACTOR CERTIFICATION

I certify that I am presently the legal owner of the above-described property.  Further, I acknowledge the filing of this application and certify that all of the information on the application is true and correct.  I grant permission to the City to conduct site visits necessary to investigate the proposed project.  (If the undersigned is different from the legal property owner, then a letter of authorization must accompany this form).  A licensed contractor is authorized to submit an over-the-counter application and obtain permits on behalf of the property owner.  I acknowledge that the City strongly encourages me to immediately calendar the expiration date of this permit, that it is my responsibility to monitor its status and that the City has no ability to provide relief when a permit has expired.

_____     _____     _____
PROPERTY OWNER SIGNATURE          PROPERTY OWNER NAME (PRINT)          DATE

_____     _____     _____
APPLICANT/CONTACT SIGNATURE       APPLICANT/CONTACT NAME (PRINT)       DATE

---

**STAFF USE**

CASE #(s): _____     DATE RECEIVED: _____

---

**RJN - 92**

EXHIBIT C

Case 2:20-cv-08781-PA-MRW   Document 13-1   Filed 12/03/20   Page 94 of 96   Page ID #:198

## 17.68.070 Conditions of approval.

In approving an application for a temporary use permit, the director may impose such conditions as are deemed necessary to insure that the permit will be in accord with the findings required by Section 17.68.060. These conditions may involve any pertinent factors affecting the operation of the temporary use, and may include but are not limited to the following:

A.   Provision of adequate temporary off-street parking facilities, including vehicular access and egress as defined by the planning director;

B.   Regulation of nuisance factors such as, but not limited to, the prevention of glare or direct illumination of adjacent properties, noise, vibrations, smoke, dust, dirt, odors, gasses and heat;

C.   Regulation of temporary buildings, structures and facilities, including placement, height and size, location of equipment and open spaces, including buffer areas and other yards;

D.   Provision of sanitary and medical facilities;

E.   Provision of solid waste collection and disposal;

F.   Provision of security and safety measures;

G.   Regulation of signs;

H.   Regulation of operating hours and days, including limitation of the duration of the temporary use to a shorter time period than that requested, and limiting the hours for event set-up, break-down, and clean-up;

I.   Submission of a performance bond or other surety devices to ensure that any temporary facilities or structures used for such proposed temporary use will be removed from the site within a reasonable time following the event and that the property will be restored to its former condition;

J.   Submission of a site plan indicating any information required by this chapter;

K.   Requirement that the approval of the temporary use permit is contingent upon compliance with applicable provisions of other ordinances;

L.   Such other conditions which will ensure the operation of the proposed temporary use in an orderly and efficient manner and in accord with the intent and purpose of this chapter;

M.   Applicants for special event permits shall:

1.   Provide containers for recycling cans, glass, plastic and paper generated,

2.   Provide information and guidance to assure recycling of materials listed above,

3.   Comply with the city's solid waste recycling ordinance, and

4.   Submit a plan indicating efforts to reduce, reuse or recycle waste generated;

N.   The event shall not cause any noises, sounds or vibrations which are physically annoying to reasonable persons of ordinary sensitivity or which are so harsh or so prolonged or unnatural or unusual in their use, time or place as to occasion unnecessary discomfort to any persons within a five hundred (500) foot radius of the place from which such noises emanate or which interfere with the peace and comfort of residents, occupants or guests of the surrounding neighborhood, or the operators or customers in places of business in the vicinity;

O.   The applicant shall demonstrate that the holding capacity of surrounding streets and intersections is sufficient to sustain the use without conflicting with established general plan goals and policies;

P.   Submission of additional services bond for the purpose of protecting, assisting and regulating the proposed event. The cost of providing such additional services shall be paid in advance to the city by the applicant;

Q.   The temporary use shall conform to city planning department, building and safety department, public works department, Los Angeles County fire prevention bureau, Los Angeles County sheriff's department, Los Angeles County

RJN - 94

mountain and rural sanitation department programs, regulations and requirements;

R.    The applicant shall defend, indemnify, and hold harmless the city and its officers, agents, and employees from any claim, action or proceeding against the city or its officers, agents, or employees to attack, set aside, void, or annul approval of this permit;

S.    The applicant shall furnish insurance in the amount to be determined by the planning director, but in no event less than one million dollars ($1,000,000.00) to protect the city against claims of third persons for personal injury, wrongful death and property damage;

T.    The applicant shall have a copy of the approved temporary use permit available on-site during the entire duration of the use. (Ord. 190 § 7, 1999; prior code § 9496)

---

View the mobile version.

# **PROOF OF SERVICE**

I, Wendy Hoffman, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 1230 Rosecrans Avenue, Suite 110, Manhattan Beach, California 90266.

On December 3, 2020, I electronically filed the attached document:

CITY OF MALIBU'S REQUEST FOR JUDICIAL
NOTICE IN SUPPORT OF MOTION TO DISMISS

with the Clerk of the court using the CM/ECF system which will then send a notification of such filing to the following:

Jeremy Talcott                           Christopher M. Kieser
Pacific Legal Foundation                 930 G Street
1212 W. Amerige Avenue                   Sacramento, CA 95814
Fullerton, CA 92833-2709                 Phone:   (916) 419-7111
Phone:   (916) 419-7111                  Fax:     (916) 419-7747
Fax:     (916) 419-7747                  Email:   ckieser@pacificlegal.org
Email:   jtalcott@pacificlegal.org

Mark Miller                              Jamee Jordan Patterson
Pacific Legal Foundation                 Department Of Justice
4440 PGA Boulevard, Suite 307            PO Box 85266
Palm Beach Gardens, FL 33410             San Diego, CA 92186-5266
Phone:   (561) 691-5000                  Phone: (619) 738-9329
Fax:     (916) 419-7747                  Fax: (619) 645-2271
Email:   mmiller@pacificlegal.org        *Courtesy copy via U.S. Mail*

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 3, 2020, at Manhattan Beach, California.

/s/ Wendy Hoffman
_____

PROOF OF SERVICE